# LOUIS H. SILVERSTEIN *v.* STATE OF MARYLAND.

[No. 16, April Term, 1939.]

534

*Decided May 17th, 1939.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*William Greenfeld,* with whom were *Henry Lazarus* and *Arthur Beane* on the brief, for the appellant.

*H. Vernon Eney, Assistant Attorney General,* with whom were *William C. Walsh, Attorney General, J. Bernard Wells, State's Attorney for Baltimore City,* and *William H. Maynard, Deputy State's Attorney,* on the brief, for the State.

PARKE, J., delivered the opinion of the Court.

The appellant, Louis Silverstein, was indicted, tried by the court sitting as a jury, convicted and sentenced for a violation of the statute against gambling. The traverser was convicted generally under an indictment of twelve counts, which presented the various aspects of the anticipated testimony in regard to several inhibitions of the statute denouncing lotteries and gambling. The only questions for consideration are the rulings on evidence. There were two exceptions taken. The first is ignored by the traverser on brief and in argument and may not be considered on appeal because it is improperly presented. The confusing practice was followed of taking all the testimony of a witness subject to exception. When his examination in chief and cross-examination were closed, the traverser "made a motion to strike out the testimony and the court overruled the motion and granted the defendant an exception." Although much of the testimony of the witness is clearly admissible, it is not the function of the court of trial to assume and fulfil the duty of an advocate,

and divide and distinguish a mass of testimony with reference to its admissibility in evidence and, after thus laboring, to group and formulate the questions, to rule with reference to every particular problem of evidence involved.

If counsel make at the trial table a motion to exclude the general testimony of a witness, which has been taken subject to exception, but fail to specify and designate the particular testimony which is sought to be excluded, no proper basis is afforded to grant the motion, and an exception thereupon taken may raise no question for determination on appeal. *Bogart v. Willis,* 158 Md. 393, 397, 398, 148 A. 585.

Under the second bill of exceptions the propriety is raised of the court's refusal to exclude certain testimony on the theory that it had been obtained by means of an unlawful search and seizure and was inadmissible under section 4A of article 35 of the Code (Supp. 1935). This statutory provision reads: "4A. No evidence in the trial of misdemeanors shall be deemed admissible where the same shall have been procured by, through, or in consequence of any illegal search or seizure or of any search and seizure prohibited by the Declaration of Rights of this State; nor shall any evidence in such cases be admissible if procured by, through or in consequence of a search and seizure, the effect of the admission of which would be to compel one to give evidence against himself in a criminal case."

It is conceded that there is no error in the admission in evidence of the traverser's coat, a lottery book, lottery slips, which were taken from the pocket of this coat, and torn lottery tickets, which were thrown on the floor of the room in which the traverser carried on a retail grocery store, unless this evidence was obtained by an unlawful search and seizure under circumstances now to be stated.

The store is on the first floor of a building at the corner of two streets in Baltimore City. The business is conducted in a room about twelve feet wide and twenty-

five feet long. The store is entered from the street by a door in the front of the room. A long counter extends along the length of the inside wall of the room, and a short counter is across the room at the rear.

On information received, a detail of policemen in plain clothes was sent to investigate if the law against gambling was being violated on the premises of the traverser. On their arrival, Officer Scott opened the store door, and went in, while the other members of the detail stayed outside. As he entered, the officer found eight or ten persons in the store room. The proprietor and traverser was standing back of the long counter, about eight feet from the doorway, and was engaged in waiting on a customer. The traverser's clerk is one Stewart, who, dressed in a white coat, was behind the short counter at the back of the store. In front of this counter, and before Stewart, a person named Adams was standing. He was the only person near Stewart, whose head, shoulders and hands were seen by the officer. As the officer walked toward Stewart, he observed that he was bending forward, and engaged in writing in a book on the counter between him and Adams. While the officer was walking by the traverser, the latter observed the officer and shouted "Watch out," and, in about two steps, the officer reached the counter where the clerk was writing numbers in the book. At the warning cry given by the traverser, all eyes turned toward the door, and the officer saw Stewart take the book from the counter and drop it behind or beneath the counter.

A few minutes later, the traverser approached the officer and asked what he wanted, and the officer replied that he wanted "to write a number," which is a form of gambling by lottery. The answer by the traverser was "I don't write numbers." And the officer said "All right," and remained at his station while the traverser returned to the long counter to serve customers. Meanwhile, some one was seen by the officer to signal to the traverser from the doorway, and a few minutes later the detail of policemen came in, and the officer gave them an account of what he had seen.

On cross-examination, it was developed that the officer did not know Adams, nor whether of a certainty he was a customer for a lottery slip or of the grocery store, nor in what relation and in what respect the entries in the book were made. The officer further stated that the warning given by the proprietor could have been addressed to any one in the store. These qualifications, however, do not make unreasonable and improbable the grounds for the conclusion of the officer that gambling by lottery was being carried on in his presence. There was no occasion for the proprietor to utter a warning. No one was unaware of an imminent physical danger or situation which required an immediate and peremptory warning. Nor did any one engage in the course of an honest transaction need any protective admonition. The warning was reasonably and naturally understood to be addressed to some present wrongdoer.

The customers and the clerk did one thing of indefinite significance in common. They all looked toward the door as the natural entrance for the danger against which the traverser warned. The clerk did more, and his action, as well as the sudden outcry of the traverser, were the two things which were indicative of personal guilt. The clerk, at the warning given, swept the book, in which the officer had seen him writing numbers, off the counter and out of sight behind the counter. An innocent entry in a book of account between a grocer and his customer requires no concealment, and certainly is a transaction wholly inconsistent with any necessity for the precipitate removal of the book and its designed, quick, hiding by the clerk at the first sound of alarm by the grocer.

All of these facts and circumstances were observed by the officer, and were of such a nature as would justify a careful and prudent person in the belief that a crime against gambling, as denounced by the statute, had been committed in his presence or view by the proprietor and his clerk, and that it was his duty to make their arrest without a warrant. *Mitchell v. Lemon*, 34 Md.

176, 180, 181; *Boyd v. Cross*, 35 Md. 194, 199, 200; *Roddy v. Finnegan*, 43 Md. 490, 501, 503, 504; *Jordan v. James & Holstrom Piano Co.*, 140 Md. 207, 211-213, 117 A. 366; *Edger v. Burke*, 96 Md. 715, 724, 725, 54 A. 986.

The policeman who first entered the store remained at his post in front of Stewart, with the counter between them. He there reported to Sergeant Amrein, the police officer in charge of the detail, what he had seen. The sergeant called the traverser and told him of the information received, and that he was going to look back of the counter. The sergeant did so, and found the book, which Stewart had tried to hide. The book proved to be one used in the conduct of a lottery. On one of the pages, the officer found "that lottery had been written but it had not been finished." The sergeant picked the book up and showed it to the traverser and to his clerk Stewart. In addition to the book for a lottery, the sergeant found torn lottery tickets lying alongside of the book. Addressing the clerk, the sergeant, in the presense of Silverstein, inquired of Stewart for whom he was writing numbers. The clerk replied that Silverstein owned the book and that he was writing "numbers" for the traverser. The sergeant, without a warrant, then placed the traverser under arrest. Whereupon the traverser took off his coat and laid it down on the counter, and the sergeant put his hand in the lower left-hand pocket of the coat and brought out some lottery tickets. On the sergeant's inquiry of the traverser whether the tickets were his, the accused replied that he knew nothing about them, and he gave no other explanation of their possession. It was thus conclusively established that a gambling device was in operation in the presence and within the view of the first officer when he went into the store room.

It should be remarked that the lottery book and torn lottery tickets, which had been cast on the floor, were picked up by the sergeant before the arrest of the traverser, and the traverser's coat and the lottery slips found by the sergeant in the pocket of the coat were

taken into possession by the police after the traverser's arrest. The admission in evidence of these facts and articles is the error of which the traverser complains. The traverser and his clerk were indicted jointly, and it is in evidence that the clerk had pleaded guilty on his arraignment.

Before the passage of chapter 194 of the Acts of 1929, which is known as the Bouse Act, and is codified as section 4A of article 35 of the 1935 Supplement of the Code, evidence which had been procured by means of an unlawful search and seizure was admissible in this state. *Lawrence v. State,* 103 Md. 17, 36, 37, 63 A. 96; *Meisinger v. State,* 155 Md. 195, 196, 199, 141 A. 536, 142 A. 190; *Heyward v. State,* 161 Md. 685, 694, 158 A. 897; *Nolan v. State,* 157 Md. 332, 339, 146 A. 268; *Baum v. State,* 163 Md. 153, 156, 161 A. 244; *Zukowski v. State,* 167 Md. 549, 555, 175 A. 595. The effect of the statutory change is to make inadmissible in the trial of misdemeanors evidence which is obtained by means of an unlawful search and seizure. The crime with which the traverser was accused is a misdemeanor, which, as has been seen, was committed in the presence or view of one of a detail of police officers, and by him forthwith communicated to the detail as soon as they entered the store room. It was thereafter immaterial which of the officers of the detail placed the traverser under arrest. *Balto. & O. R. Co. v. Cain,* 81 Md. 87, 99-104, 31 A. 801; *Brish v. Carter,* 98 Md. 445, 449, 450, 57 A. 210.

It is the law of Maryland that if a misdemeanor be committed in the presence or view of a police officer, he may arrest the offender forthwith, without first having obtained a warrant to do so. *Roddy v. Finnegan,* 43 Md. 490, 504; *Heyward v. State,* 161 Md. 685, 692, 158 A. 897; *Blager v. State,* 162 Md. 664, 665-667, 161 A. 1; *Callahan v. State,* 163 Md. 298, 300-302, 162 A. 856; 1 *Bishop's New Criminal Procedure,* sec. 183.

After such a lawful arrest, the officer may, as an incident of the arrest, contemporaneously search the per-

son of the offender, and search for and seize the tangible evidence or instrument of the crime, whether upon his person or within his use and immediate control or possession. *Callahan v. State,* 163 Md. 298, 300-301, 162 A. 856; *Carroll v. United States,* 267 U. S. 132, 149, 150, 158, 45 S. Ct. 280, 69 L. Ed. 543; *Agnello v. United States,* 269 U. S. 20, 30, 46 S. Ct. 4, 70 L. Ed. 145; 1 *Cooley's Constitutional Limitations* (8th Ed.), pp. 628-629; *Cornelius on Search and Seizure* (2nd Ed.), p. 95, par. 37. The room of the traverser in which the commission of the crime was observed would be within this rule with respect to the instruments and evidence of the crime. *Getchell v. Page,* 103 Maine 387, 389, 69 A. 624; *Patrick v. Commonwealth,* 199 Ky. 83, 250 S. W. 507, and *infra.*

The police commissioner, who acts chiefly through his subordinates, the police officers, is charged with the duty "at all times of the day and night, within the boundaries of the City of Baltimore" to "preserve the public peace, prevent crime and arrest offenders * * * see that all laws relating to * * * gambling * * * lotteries and lottery policies * * * are enforced." Public Local Laws of Baltimore City (Flack, 1938), art. 1, sec. 873, p. 481. These same provisions are found in chapter 123 of the Acts of 1898, sec. 744, and are quoted in *Police Commrs. for City of Baltimore v. Wagner,* 93 Md. 182, 192, 48 A. 455, 456, where the duties of the police commissioners (now commissioner) are thus stated: "By what means they are to prevent crimes is not defined; but it is clear that in exercising such a power, they must act in accordance with the well-established rules of persons and property, so that the rights of the citizens shall not be invaded under the pretense of protecting them. Subject to these limitations, they are charged with the duty of acting intelligently, astutely, and industriously in preventing every infraction of the law that would result in destroying or injuriously affecting the peace of society, or in the commission of crime."

There is here no testimony of an unlawful or unreasonable search and seizure. The first officer and those

of the detail did not employ any force to enter the premises. They went in through the door of the store, which was open to the public for the patronage not only of the lawful business of a grocer but also of the criminal gambling by the lottery there maintained. The testimony tends to show that in order to prevent the detection of his unlawful business, the traverser relied upon a system of espionage, and his own watchfulness, to stop the gambling before it could be observed by those who might enter, if they were either officers of the law or not accredited players of the gambling device, or not customers of his grocery upon whose acquiesence and silence ·he could rely. The failure of this system did not make one who entered either for groceries or for gaming a trespasser. Such a person's entrance is permissive, and the negation of the force, actual or constructive, in the entry and quest upon which the application of the doctrine of an unauthorized search and seizure depends. *State v. Quinn*, 111 S. C. 174, 97 S. E. 62.

So, if a grocer keep his public place of business open in an implicit invitation to the public to enter for the lawful business of his grocery and for the unlawful business of gambling there by him conducted, and the invitation be accepted by a spy or an officer in plain clothes, with a view of ascertaining if information to this effect be true, the entry of the spy or officer is no more a trespass than if made by a customer either in his lawful or in his illegal business. What the statute law quoted forbids to be given in evidence in the case of a misdemeanor is only if the search and seizure be unreasonable. The point is susceptible of further illustration.

Should, on information, a police officer go to the place of business of a retail merchant to inquire if cigarettes and tobacco be sold on his premises without a license, and he sees a package of cigarettes being sold over the counter to a purchaser by the clerk of the merchant and, on a warning given by the merchant, the clerk, in the sight of the officer, throw the package to the floor

behind the counter, and, the officer, looking behind the counter, observes the package on the floor with other packages of tobacco, and thereupon arrest the merchant and his clerk and take possession of the packages of cigarettes, the articles seized as evidence could not be excluded on any rational basis. Again, if a dealer be licensed to sell at his place of business light wines and beer, and, on information that he sells whiskey in violation of law, a police officer in plain clothes enter his place of business and order a drink of whiskey and, in the course of its service by the bartender, a warning be sounded by the dealer, and the whiskey be spilled in the sight of the officer and the bottle from which it was taken be dropped behind the bar, and the officer look behind the bar and see the bottle and other bottles of whiskey, and then place the dealer under arrest and forthwith take away these bottles as evidence of the crime thus discovered, these articles and their contents are admissible in evidence, if sound principles control rather than an unwise sentimentality in behalf of the actors in an observed crime. The admissibility of such tangible instruments or evidence within the place of discovered crime would be reasonable by every sound test, and so would in no wise be in conflict with the statute under consideration, whose reference to the Declaration of Rights simply directs attention to the formal requisites of a valid warrant. Article 26. *Supra; Weeks v. United States,* 232 U. S. 383, 392, 34 S. Ct. 341, 58 L. Ed. 652; 1 *Bishop, New Criminal Procedure,* sec. 211; *Wigmore on Evidence* (2nd Ed.), secs. 2183-2184, and Supplement (1934) 2183, 2184, 2184A; *State v. Mausert,* 88 N. J. L. 286, 95 A. 991; *State v. Laundy,* 103 Or. 443, 204 P. 958, 974-976, 206 P. 290; *State v. Quinn,* 111 S. C. 174, 97 S. E. 62; *Infra.*

In the illustrations employed, as well as in the case on this record, the crime is committed in the presence or view of the officer, who has made no entry into the retail store of the owner by trespass with a general exploratory purpose to secure evidence of crime through

an unauthorized search and seizure. The case is clearly distinguished from the decisions in *Gorman v. State,* 161 Md. 700, 158 A. 903, and in *Miller v. State,* 174 Md. 362, 371, 198 A. 710, where the gambling equipment was seized in each of the traversers' private dwelling, which the officer, without leave, had entered on suspicion, but without a search warrant or one for the defendant's arrest.

It should further be recalled that, before the traverser was arrested, his confederate in crime had informed the officer, in the presence of the traverser, and without his denial, that they were jointly engaged in the gambling game observed by the officer. Under such circumstances, no writ of search and seizure would be required before the officer could proceed. Immediate action on his part would be exigent, as the prosecution of the offender might well be defeated by the loss of the best evidence of the crime in the ensuing delay in obtaining the writ. It would be the officer's clear right and plain duty not only to make the arrest, but also to seize the articles in visible use in the commission of the crime, and such others as should there be found under his control and so associated with the crime as to be of evidentiary value in its proof. *Supra; Police Commrs. for City of Baltimore v. Wagner,* 93 Md. 182, 192-194, 48 A. 455; *Underhill's Criminal Evidence* (3rd Ed.), sec. 749, pp. 1047-1048 (3), sec. 750. See *In re Ajuria,* 57 Cal. App. 667, 207 P. 515; *Smuk v. People,* 72 Colo. 97, 209 P. 636; *Comm. v. Smith,* 166 Mass. 370, 44 N. E. 503, 504; *Marron v. United States,* 275 U. S. 192, 48 S. Ct. 74, 72 L. Ed. 231; *Carroll v. United States,* 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543; *Adams v. New York,* 192 U. S. 585, 24 S. Ct. 372, 48 L. Ed. 575.

On the ground stated, that the contemporaneous taking of the articles admitted in evidence was incidental to a lawful arrest, the judgment must be affirmed.

*Judgment affirmed, with costs.*