JOHNSON *v.* STATE

[No. 143, October Term, 1948.]

140

Decided May 18, 1949.

The cause was argued before MARBURY, C. J., and DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Paul D. Taggart,* for appellant.

*Harrison L. Winter, Assistant Attorney General,* with whom were *Hall Hammond, Attorney General,* and *Walter W. Dawson, State's Attorney for Montgomery County,* on the brief, for appellee.

GRASON, J., delivered the opinion of the Court.

On the afternoon of September 25, 1948, six officers of the Montgomery County Police went to the home of Lillian C. Johnson, situated on Ritchie Avenue, in Silver Spring, Montgomery County, Maryland, and known as 501 Ritchie Avenue. Corporal Miller had a warrant, sworn out before a justice of the peace, charging the Johnson woman with operating a disorderly house at this residence. Only two of these officers testified at the trial, Corporal Miller and Sergeant Whalen.

Sergeant Whalen said they entered the screen door, which was unlatched, and found the traverser and another colored woman in the dining room, "just sitting there talking". He said Corporal Miller read the warrant to the traverser. "Q. Then what, if anything, did

you do after reading the warrant? A. We searched the house."

Corporal Miller said: "The Inspector walked up on the porch and I walked in back of him and the door was open, rather unlocked, I walked in and Catherine (meaning the traverser) was in the living room and I said, 'Catherine, just stand right there, I got a warrant here for you for running a disorderly house', I read the warrant to her; everybody stood as they were until I finished reading the warrant, and then we started looking around and found various things."

These women were the only people in the house at the time. There was no crime being committed by these women, that the officers saw at the time. Sergeant Whalen said: "On the table in the dining room I observed a pasteboard box with a quantity of numbers slips in it, along with $1.10 in change." Corporal Miller said: "That wastebasket (referring evidently to what Whalen discribed as a pasteboard box) was sitting by the telephone stand, directly inside the front door, or rather, in front of the door of the living room, right around the corner from the front door." This pasteboard box, or wastebasket, is not described. How deep it was, what it contained, whether or not any of the officers saw any numbers slips in it, or any money at the time of the serving of the warrant is not stated. Whalen says that the pasteboard box was on the table in the dining room. Miller says the wastebasket was "in front of the door of the living room, right around the corner from the front door" and "was sitting by the telephone stand." The testimony fails to show that these officers at the time of the reading of the warrant to the traverser saw anywhere in that room any slips or other material used in the operation of a lottery.

This was a frame, four-room bungalow with an enclosed porch. Immediately after the reading of the warrant these officers swarmed through this house and searched everything in it. It is perfectly apparent that the lottery slips and other matter used in connection with

the operation of a lottery that was found in the paste-board box was the result of this search. The search revealed a quantity of material used in the operation of a lottery; it also revealed a quantity of empty beer bottles and whiskey bottles, a case of beer that had not been opened, some whiskey bottles that had been opened but their contents not entirely consumed, glasses and other things that might or could be used in carrying on the business of the sale of intoxicating liquors. This search, as we have said, was thorough and consumed consider-able time. Possessed of the fruit of the search, Sergeant Whalen swore out the following warrants before a justice of the peace, charging: 1. That Lillian C. John-son "did have in her possession lists, slips, and records drawn in a lottery in this state or elsewhere," and 2. That she did "unlawfuly violate Article 2B, section 2, Code 1939, in that she did have in her possession certain alcoholic beverages for the purpose of sale and delivery in this state without a license".

When this woman was arraigned before the trial magis-trate on these three charges she prayed a jury trial. The cases were sent to the Circuit Court for Montgomery County. Before the trial there was a motion to quash a warrant "under which the person and home of the defendant was searched" and to suppress the evidence seized. This motion is confusing. The search was made at the serving of the warrant charging the traverser with maintaining a disorderly house. There was no reason to quash this warrant and we think that the trial court was right in overruling the motion. But as objection was made to the articles seized by the police in this search, as they were offered in evidence, the question as to whether the search was reasonable is presented to this court.

It was agreed by counsel for traverser and the State that all three of these charges be tried together, which was done. The trial was before a jury, and the traverser was found guilty on all three charges. All three of these charges are misdemeanors. The court suspended sen-tence under the conviction of selling intoxicating liquors

without a license. Judgment and sentence were passed in the other cases, from which appeals were taken to this court.

At the trial below it was shown by the State that Sergeant Whalen and Corporal Miller secreted themselves in a house opposite the home of Lillian C. Johnson. They conducted a vigil on September 19, 20, 21 and 25, 1948. They were there on these occasions from around noon until ten or eleven o'clock at night. They described to the jury what they saw, which may be summarized as follows: A number of colored people came to and departed from this house. Most of them were men, but there were some women in this concourse. A few of them were intoxicated when they entered. Most of them were intoxicated when they left, some exhibiting bottles of beer and bottles of whiskey when they left. Some stayed in a very short while, some stayed there for a considerable time, and some the officers did not see depart. They came in automobiles, some bearing Maryland tags and some District of Columbia tags; some on foot; and one used a horse-drawn vehicle. Some came out so drunk that they could not stand. There was some cursing and foul language used. This was the evidence upon which the warrant charging the traverser with conducting a disorderly house was based. One of the officers was asked why he did not arrest these people, and he said they were on private property. They certainly were close to and near a public highway, and from the evidence there was drunkenness and disorderly conduct. Just why an arrest could not have been made by the officers at that time seems to be strange.

The first question presented is: Did this search and seizure which the officers conducted in this case, without having procured a search warrant to do so, violate Articles 26 and 22 of the Maryland Declaration of Rights, and section 5, Article 35, Code 1939, known as the Bouse Act? Article 26 provides:

"That all warrants, without oath or affirmation, to search suspected places, or to seize any person or prop-

erty are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

Article 22 provides:

"That no man ought to be compelled to give evidence against himself in a criminal case."

Section 5, Article 35, Code 1939, provides:

"No evidence in the trial of misdemeanors shall be deemed admissible where the same shall have been procured by, through, or in consequence of any illegal search or seizure or of any search and seizure prohibited by the Declaration of Rights of this State; nor shall any evidence in such cases be admissible if procured by, through or in consequence of a search and seizure, the effect of the admission of which would be to compel one to give evidence against himself in a criminal case."

The 4th Amendment to the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The 5th Amendment to the Constitution of the United States provides, among other things, as follows:

"* * * nor shall (any person) be compelled in any Criminal Case to be a witness against himself, * * *."

Articles 26 and 22 of the Maryland Declaration of Rights are *in pari materia* with the 4th and 5th Amendments to the Constitution of the United States. *Bass v. State,* 182 Md. at 500, 35 A. 2d 155.

The traverser urges that the search and seizure in this case violates Articles 26 and 22, as well as violates section 5 of Article 35 of the Code. She contends that it was an unreasonable search.

The State contends that the search was reasonable because it was made as an incident to a valid arrest.

We will not stop to give the background and history of Articles 26 and 22 of the Maryland Declaration of Rights, nor of the 4th and 5th Amendments to the Constitution of the United States. See *Gorman v. State,* 161 Md. 700, 158 A. 903; *Bass v. State,* 182 Md. 496, 35 A. 2d 155; *Miller v. State,* 174 Md. 362, 198 A. 710; Boyd *v. United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; *Asner v. State,* 193 Md. 68, 65 A. 2d 881.

Judge Melvin said in the *Bass* case, *supra,* [182 Md. 496, 35 A. 2d 158]:

"Ever since the early days of this doctrine, down to the present time, the rights secured by these constitutional provisions, both Federal and State, have been regarded by the Courts as very precious ones to be safeguarded by them with all the power and authority at their command. *Gouled v. United States,* 225 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647; *Gorman v. State,* 161 Md. 700, 158 A. 903; *Miller v. State,* 174 Md. 362, 198 A. 710; *United States v. Sam Chin,* D. C., 24 F. Supp. 14."

And the protection against illegal search and seizure given the citizen under the 4th Amendment to the Constitution of the United States has been characterized "as of the very essence of constitutional liberty * * *." *Gouled v. United States,* 255 U. S. 298, 41 S. Ct. 261, 263, 65 L. Ed. page 650; *Harris v. United States,* 331 U. S. 145, 67 S. Ct. 1098, 91 L. Ed. at page 1405.

In *Olmstead v. United States,* 277 U. S. 438, 48 S. Ct. 564, 568, 72 L. Ed. at page 951, 66 A. L. R. 376, Chief Justice Taft said:

"Justice Bradley, in the *Boyd* Case, and Justice Clarke in the *Gouled* Case, said that the Fifth Amendment and the Fourth Amendment were to be liberally construed to effect the purpose of the framers of the Constitution in the interest of liberty."

Under the common law in Maryland the 26th and 22nd Articles of the Maryland Declaration of Rights are construed as limitations upon the power of the Legislature

to pass any law or of the courts to issue any process that violates these articles, but do not apply to individuals or police officers in procuring evidence to be used by the State in a criminal prosecution. In such cases it is held that the court would not inquire into the method of procuring evidence nor make an issue concerning how it was procured, but if it was relevant to an issue involved in a case it was admitted.

*Resnick v. State,* 183 Md. page 17, 36 A. 2d 347, and cases cited. This is the common law rule. It was the rule in Maryland in all cases until the adoption of the Bouse Act, and since that time the common law rule does not apply in Maryland in prosecutions for misdemeanors. The common law rule still applies in Maryland in cases of felony.

The Supreme Court of the United States held that the 4th and 5th Amendments to the Constitution of the United States were limitations on Federal power, which did not apply to the States. It recognized the common law rule as applied in a State prosecution. *Adams v. New York,* 192 U. S. 585, 24 S. Ct. 372, 48 L. Ed. page 575.

In the *Boyd* case, *supra,* the court struck down a statute as void that compelled one to produce his private papers which were to be used against him by the authorities. That case was decided on February 1, 1886. The Supreme Court did not have occasion to examine the common law rule as applied to evidence illegally seized by government officers until the *Weeks case,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, which was decided on February 24, 1914. In that case the court denounced the practice of receiving evidence, in the trial of Federal cases, that was procured by violating the 4th and 5th Amendments, and since that time it has been made certain that the 4th and 5th Amendments to the Constitution of the United States are not only limitations upon Federal power and court process but apply to the action of individuals.

In the *Olmstead* case, *supra*, it was held that:

"The Weeks Case announced an exception to the common-law rule by excluding all evidence in the procuring of which government officials took part, by methods forbidden by the Fourth and Fifth Amendments. Many state courts do not follow the *Weeks* Case. * * * But those who do, treat it as an exception to the general common-law rule and required by constitutional limitations."

It will thus be seen that the rule in this State is the same as the rule in the Federal courts, with the exception that in this State the common law rule applies in cases of felony. Thus, the decisions in the Federal courts, especially in prosecutions for misdemeanors, are precedents in this State, but this court is not bound to follow all Federal cases as precedents. *Twining v. New Jersey,* 211 U. S. 78, 29 S. Ct. 14, 53 L. Ed. page 105; *Weeks v. United States, supra; Palko v. Connecticut,* 302 U. S. 319, 58 S. Ct. 149, 82 L. Ed. 288; *Adamson v. California,* 332 U. S. 46, 67 S. Ct. 1672, 91 L. Ed. 1903, 171 A. L. R. 1223; *Bute v. Illinois,* 333 U. S. 640, 68 S. Ct. 763, 92 L. Ed. 986: In the recent decisions of the Supreme Court of the United States, at least the preponderance of the cases seem to follow the rule that in circumstances where no emergency exists, and where there is ample time to procure a search warrant, and a search and seizure is made without a search warrant, the evidence discovered by the search will not be received in evidence at the trial. Time seems to be the element stressed in these cases, and where there is time to procure a search warrant one must be secured by the law enforcement agents.

The case of *Trupiano v. United States,* 334 U. S. 699-716, 68 S. Ct. 1229, 92 L. Ed. 1663, decided June 14, 1948 (a five to four decision), was a prosecution under the Volstead Act, 27 U. S. C. A. §1 *et seq.*, for the illegal operation of a still. Federal agents entered the premises lawfully. One agent saw a man actually operating the still, and arrested him. Another agent saw, in the same building where the still was being operated, articles used

in distilling whiskey, and seized the same. A third agent saw a truck near this building and seized certain incriminatory material found therein. These agents had plenty of time to procure a search warrant. They did not. Several people were indicted and convicted. All the material seized was admitted in evidence by the trial court. The Supreme Court of the United States, in this case, sustained the conviction of the man found operating the still, but the convictions of the other defendants were reversed, holding that the evidence seized by these agents should not have been admitted in evidence because they were seized without a search warrant and the law enforcement agents had plenty of time to procure a search warrant.

In the case of *Johnson v. United States,* 333 U. S. 10, 68 S. Ct. 367, 369, 92 L. Ed. 436, decided February 2, 1948 (a five to four decision), the court said:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. * * * When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

The court held that it was error to have received in evidence articles seized, and the case was reversed. In that case the federal officers entered a room in a hotel, after smelling opium. They knocked at the door, announced themselves as officers and were admitted by the

traverser. The search revealed opium and a smoking apparatus, warm from recent use.

*McDonald v. United States,* 335 U. S. 451, 69 S. Ct. 191, 192, 93 L. Ed. 153, decided December 13, 1948, involved prosecution for the offense of carrying on a lottery known as the numbers game. Three police officers surrounded the house. They did not have a warrant for arrest, nor for a search. While outside of the house one of the officers thought he heard an adding machine, frequently used in the numbers game. Believing that the numbers game was in process, an officer opened the window leading into a lady's room, climbed through, and admitted the other officers to the house. They searched the rooms on the ground floor and proceeded to the second floor. The door of a bedroom was closed, and one of the officers stood on a chair and looked through the transom. He observed two persons in the room, as well as numbers slips, money piled on the table, and an adding machine, which were seized. Referring to the 4th Amendment, the court said:

"This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike. * * * Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals."

In that case the officers had one of the accused under surveillance, suspecting him of operating a numbers game, and there was plenty of time to have procured a search warrant.

The *Harris* case, 331 U. S. 145, 67 S. Ct. 1098, 1102, 91 L. Ed. 1399, decided May 5, 1947, (a four to five decision), is much relied on by the State. In that case two valid warrants for arrest were issued. One charged

that Harris and Moffett violated the Mail Fraud Statute, 18 U. S. C. A. § 1341, and the other, the National Stolen Property Act. 18 U. S. C. A. § 2311 *et seq*. Under the authority of these two warrants, five agents went to his apartment and arrested him. Their objective was to find two stolen checks used to commit the thefts. The apartment consisted of four rooms. Following the arrest they searched the entire apartment. The search consumed nearly five hours. As the search neared its end, one of the agents discovered in a bedroom bureau drawer a sealed envelope marked "George Harris, personal papers." It contained classification cards and registration certificates possessed in violation of the Selective Training and Service Act of 1940, 50 U. S. C. A. Appendix, § 301 *et seq*. Harris was indicted for violating this Act. It was said in that case:

"Nor can support be found for the suggestion that the search could not validly extend beyond the room in which petitioner was arrested. Petitioner was in exclusive possession of a four-room apartment. His control extended quite as much to the bedroom in which the draft cards were found as to the living room in which he was arrested. * * * The search was not a general exploration but was specifically directed to the means and instrumentalities by which the crimes charged had been committed, particularly the two canceled checks of the Mudge Oil Company."

Article 26 of the Maryland Declaration of Rights condemns "all general warrants to search suspected places * * * without naming or describing the place, * * *." The 4th Amendment to the Constitution of the United States provides: "* * * no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." It is hard to conceive how a search warrant could have been procured by the agents, in the *Harris* case, to search for papers they had no idea that Harris possessed. We cannot make the same distinction as the court did in the *Harris* case

from the cases of *Go-Bart Importing Co. v. United States,* 282 U. S. 344, 51 S. Ct. 153, 75 L. Ed. 374, and *United States v. Lefkowitz,* 285 U. S. 452, 52 S. Ct. 420, 76 L. Ed. 877, 82 A. L. R. 775, viz.:

"Nor is this a case in which law enforcement officers have entered premises ostensibly for the purpose of making an arrest but in reality for the purpose of conducting a general exploratory search for merely evidentiary materials tending to connect the accused with some crime." Citing the *Go-Bart* and *Lefkowitz* cases, *supra.*

In the *Go-Bart* case a warrant was sworn out for three men, charging them with conspiracy to violate the National Prohibition Act, 27 U. S. C. A. § 1 *et seq.* The government officers went to the office of the men at No. 200 Fifth Avenue, New York. Bartels (one of the three) and the secretary-treasurer of the Company were there when the officers entered. Bartels was told by Officer O'Brien that he had a warrant to search the premises, which was false. Gowen, the president of the company, came in. O'Brien told him that he had a warrant for his arrest and a warrant to search. The agent arrested him. The officers took papers from the person of both Bartels and Gowen. They took Gowen's keys and by threats of force compelled him to open the desk and safe, searched and took papers from them, searched other parts of the office and took therefrom other papers, account books, letters, etc. The warrant of arrest was held to be invalid, and there was no search warrant. The court held, however, that the officers had information that justified the apprehension without a warrant of Gowen and Bartels for conspiracy, and on that basis it treated the arrests as lawful and valid. The court said [282 U. S. 344, 51 S. Ct. 158]:

"By pretension of right and threat of force he compelled Gowen to open the desk and the safe and with the others made a general and apparently unlimited search, ransacking the desk, safe, filing cases and other parts of the office. It was a lawless invasion of the

premises and a general exploratory search in the hope that evidence of crime might be found."

The court distinguished the *Go-Bart* case from the case of *Marron v. United States*, 275 U. S. 192, 48 S. Ct. 74, 72 L. Ed. 231.

"There, officers executing a valid search warrant for intoxicating liquors found and arrested one Birdsall who in pursuance of a conspiracy was actually engaged in running a saloon. As an incident to the arrest they seized a ledger in the closet where the liquor or some of it was kept and some bills beside the cash register. *These things were visible and accessible and in the offender's immediate custody. There was no threat of force or general search or rummaging of the place.*" Italics supplied.

In the *Lefkowitz* case, *supra,* the question was "whether searches and seizures claimed by the government to have been made as lawfully incident to the arrest of respondents on a warrant for conspiracy to violate the National Prohibition Act transgressed their rights under the Fourth and Fifth Amendments." The defendants operated from room 604 at 1547 Broadway. The room was about ten feet wide and twenty feet long and was divided by a partition. In its outer portion there was a stenographer's desk used by respondent Paris, a towel cabinet, and a wastebasket, and in the inner part another desk and wastebasket. The Deputy Marshall arrested Lefkowitz and thereupon one of the prohibition agents searched and took from his person various papers. The agents opened all the drawers of both desks, examined their contents, took therefrom and carried away books, papers, and other articles. They searched everything in the place. They also took the contents of the wastebaskets and later pasted together pieces of paper found therein. This all was done without a search warrant. The court said:

"Respondents' papers were wanted by the officers solely for use as evidence of crime of which respondents were accused or suspected. They could not lawfully be searched for and taken even under a search warrant

issued upon ample evidence and precisely describing such things and disclosing exactly where they were. *Gouled v. United States,* 255 U. S. 298, 310, 41 S. Ct. 261, 65 L. Ed. 647, [653]."

"The only question presented is whether the searches of the desks, cabinet, and baskets and the seizures of the things taken from them were reasonable as an incident of the arrests. And that must be decided on the basis of valid arrests under the warrant. Save as given by that warrant and as lawfully incident to its execution, the officers had no authority over respondents or anything in the room. The disclosed circumstances clearly show that the prohibition agents assumed the right contemporaneously with the arrest to search out and scrutinize everything in the room in order to ascertain whether the books, papers, or other things contained or constituted evidence of respondents' guilt of crime, whether that specified in the warrant or some other offense against the Act. Their conduct was unrestrained."

"This case does not differ materially from the *Go-Bart* [Importing Co.] Case and is ruled by it. An arrest may not be used as a pretext to search for evidence. The searches and seizures here challenged must be held violative of respondents' rights under the Fourth and Fifth Amendments."

In the *Trupiano* case, *supra,* the court said [334 U. S. 699, 68 S. Ct. 1234] :

"But the differences (between the *Trupiano* case and the *Harris* case) are enough to justify confining ourselves to the precise facts of this case, leaving it to another day to test the Harris situation by the rule that search warrants are to be obtained and used wherever reasonably practicable."

The *Harris* case has been rather unrestrainedly criticized by an author in the Iowa Law Review. Vol. 33, p. 472, Iowa Law Review. And see: Vol. 96, p. 128, Univ. Pa. Law Review; Vol. 15, p. 950, Univ. Chicago Law Review; Vol. 48, p. 1257, Columbia Law Review; Vol. 61, p. 1452, Harvard Law Review.

This court has had numerous occasions to interpret the Bouse Act and the 26th and 22nd Articles of the Maryland Declaration of Rights and it will not be necessary for us to review this long line of cases. We will refer to two of these cases, which we think most pertinent in consideration of the case at bar.

In *Silverstein v. State*, 176 Md. 533, 6 A. 2d 465, 468, Silverstein conducted a store in Baltimore City. Police had information that he was conducting an illegal lottery at this store. A detail of police went to investigate, and one of them entered the store, which was a room twelve feet wide and twenty-five feet long, with a door entering from the street. Without going into the facts of the case in detail, it is sufficient to say that this court said:

"It was thus conclusively established that a gambling device was in operation in the presence and within the view of the first officer when he went into the store room. * * * It is the law of Maryland that if a misdemeanor be committed in the presence or view of a police officer, he may arrest the offender forthwith, without first having obtained a warrant to do so. * * * After such a lawful arrest, the officer may, as an incident of the arrest, contemporaneously search the person of the offender, and search for and seize the tangible evidence or instrument of the crime, whether upon his person or *within his use and immediate control or possession.*" Italics supplied. The court cites: *Callahan v. State*, 163 Md. 298, 300-301, 162 A. 856; *Carroll v. United States*, 267 U. S. 132, 149, 150, 158, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790; *Agnello v. United States*, 269 U. S. 20, 30, 46 S. Ct. 4, 70 L. Ed. 145; *1 Cooley's Constitutional Limitations; Cornelius on Search and Seizure.*

"The room of the traverser in which the commission of the crime was observed would be within this rule with respect to the instruments and evidence of the crime."

In the *Agnello* case, *supra*, the arrest was made in a room in a dwelling where the crime was being committed in the presence of the law officers. There was no general search of the house, as in the case at bar.

In the Silverstein case the court further said:

"Under such circumstances, no writ of search and seizure would be required before the officer could proceed. Immediate action on his part would be exigent, as the prosecution of the offender might well be defeated by the loss of the best evidence of the crime in the ensuing delay in obtaining the writ."

In *Callahan v. State, supra,* the officer, whom traverser did not know to be such, had ordered three bottles of Bicardi rum, to be delivered to him by the traverser at a hotel in Annapolis. He told the officer that he would deliver it to him at the traverser's automobile, and when he did so the officer arrested him. Of course in that case the crime was committed in the presence and view of the officer, and he did not need a warrant to make the arrest. The court in that case said [163 Md. 298, 162 A. 857]:

"Where circumstances make an arrest lawful, though without a warrant, the safe and sure enforcement of the law permits, as an incident of his arrest, that the prisoner not only be disarmed by search, but that the tangible evidence or instrument of the crime, whether upon his person or *within his use and immediate possession,* shall be discovered and taken in custody and examined." Italics supplied. *Hill v. State,* 190 Md. 698, 701, 59 A. 2d 630, 632; *Smith v. State,* 191 Md. 329, 341, 62 A. 2d 287, 292.

This court has never construed the term "immediate possession" to confer a right as an incident to a lawful arrest to make the kind of search and seizure that was made in this case. We have seen that Articles 26 and 22 of the Maryland Declaration of Rights have been construed by this court strictly, and the Supreme Court of the United States, as we have pointed out, has construed the 4th and 5th amendments to the Constitution of the United States so as to protect the liberty of the citizen.

In the case at bar the officers watched the residence of the traverser for several days and nights. The officers

had seen a situation at that house that clearly authorized them to raid the place as a disorderly house, and of course there was plenty of evidence to justify the warrant charging the offense of keeping and maintaining a disorderly house. There was also conduct which they saw, tending to show that the traverser habitually violated the liquor laws of the State by selling intoxicating liquors without a license. But the action of the police officers in watching this house was the kind of action that they generally resort to when they suspect that gambling is being conducted, and are trying to obtain evidence that would support the issuance of a search warrant by a magistrate or a judge. At the time the warrant charging a disorderly house was served, they saw no evidence of violation of the gambling laws. We are of opinion that the search by the officers at the time they served the warrant was not justified as an incident to a lawful arrest, but was an unreasonable search and seizure, and unlawful, and a flagrant violation of the Bouse Act and the 26th and 22nd Articles of the Maryland Declaration of Rights.

The State claims that even if the search made by the officers was unreasonable and illegal, the evidence obtained by the search has nothing to do with the charge of keeping a disorderly house. In their brief they say:

"The crime of keeping a disorderly house is in no manner related to sales of alcoholic beverages without a license, as is pointed out in * * *."

The State cites the *Lutz* case (*Lutz v. State*), 167 Md. 12, 172 A. 354; *Beard v. State,* 74 Md. 130, 21 A. 700; *State v. Haas,* 188 Md. 63, 51 A. 2d 647; and *2 Wharton, Criminal Law* (1935 Edition), sections 1722-1734. These cases are not in point. As we have stated, the police officers, when they watched this house, gathered evidence which tended to show that the liquor law of the State was habitually violated. In *Wharton's Criminal Law,* Twelfth Edition, Vol. 2, section 1724, it is stated:

"The use of the house, also, as a place where infractions of the law (*e. g.,* illegal sales of liquor or gambling

or illegal betting) are habitually carried on, constitutes a disorderly house."

The evidence seized, to which we have referred, tended to show that the liquor law was habitually violated. It was pertinent and material, and as it was procured by the search, its admission in evidence constitutes reversible error.

We do not find that there was error in the rulings contained in the second and third exceptions. Judgment in case No. 57 and in case No. 59 reversed.

*Judgments reversed; cases remanded for a new trial.*

HENDERSON and MARKELL, JJ., dissent.

MARKELL, J., filed the following dissenting opinion, in which HENDERSON, J., concurred:

The question presented on this appeal is whether the lottery slips admitted in evidence—and the evidence of habitual violation of the liquor laws—were lawfully obtained by a search of defendant's residence incident to lawful arrest under a warrant charging her with operating a disorderly house at her residence. This court has repeatedly held that, after and as an incident of a lawful arrest, made with or without a warrant, an officer may contemporaneously search the person of the offender, and search for and seize the tangible evidence or instrument of the crime, whether upon his person or within his use and immediate control or within his use and immediate control or possession. "The room of the traverser in which the commission of the crime was observed would be within the rule with respect to the instruments and evidence of the crime." *Silverstein v. State,* 176 Md. 533, 540-541, 6 A. 2d 465, 468. *Cf. Lawrence v. State,* 103 Md. 17, 37, 63 A. 96; *Bass v. State,* 182 Md. 496, 506, 35 A. 2d 155; *Hill v. State,* 190 Md. 698, 702, 59 A. 2d 630, 631, citing *Harris v. United States,* 331 U. S. 145, 67 S. Ct. 1098, 91 L. Ed. 1399. If defendant had been arrested for engaging in a fist

fight on the street in Rockville—or Baltimore—the nature of the charge would have furnished no occasion for a search of her residence incident to arrest. But, as is stated in the opinion of the court, the use of a house as a place where infractions of the law such as illegal sales of liquor or gambling or illegal betting are habitually carried on constitutes a disorderly house. *State v. Williams,* 30 N. J. L. 102, 111; *Meyer v. State,* 41 N. J. L. 6; Court of Errors and Appeals, 42 N. J. L. 145. As the opinion shows, when the warrant was issued there was ample reason to believe that illegal (*i. e.,* unlicensed) sales of liquor were habitually made in the house. A search, incident to the arrest, for unopened, opened and empty beer and whiskey bottles, which were evidence and instruments of the unlawful business that made the house a disorderly house, was therefore a right and a duty of the police who made the arrest. Whatever the exact shape, size or location of the pasteboard box or wastebasket, the search for bottles, glasses and other instruments of illegal sales of liquor was not an unreasonable search and was sufficient to disclose these lottery slips. There seems to be no reason or authority for restricting the search to the particular room of the alleged disorderly house in which the arrest was made. *Harris v. United States, supra,* 331 U. S. at page 152, 67 S. Ct. 1098, 91 L. Ed. 1399 and cases cited. In a sense it may seem peculiarly artificial to distinguish between one room and another in a four-room bungalow. But there is no more reason for restricting the search of a thirty-room "speakeasy" upon arrest of the proprietor for operating it.

In the instant case the greater part of the opinion of the court is devoted to discussion of Supreme Court cases under the Fourth and Fifth Amendment, especially the four latest cases, *Harris v. United States, supra; Johnson v. United States,* 1948, 333 U. S. 10, 68 S. Ct. 367, 92 L. Ed. 436; *Trupiano v. United States,* 1948, 334 U. S. 699, 68 S. Ct. 1229, 92 L. Ed. 1663, and *McDonald v. United States,* 1948, 335 U. S. 451, 69 S. Ct. 191. It is said that the rule in Maryland, under the Bouse Act,

excluding evidence procured by an illegal search, is the same as the rule in the federal courts, under the Fourth and Fifth Amendments, and therefore the decisions in the federal courts are precedents in this state, "but this court is not bound to follow all federal cases as precedents." The opinion does not say which of the Supreme Court cases cited are to be followed or how far they are to be followed. It is impossible to reconcile all the Supreme Court cases and the cases in this court discussed or cited in the opinion. The Supreme Court, in its three latest search and seizure cases, has apparently held to be inherent in the Fourth Amendment a rule that a search or seizure, even when incident to a lawful arrest, is not lawful when made without a search warrant, except in an "emergency" when there is not sufficient time to obtain a search warrant. In the *Harris* case, *supra,* the accused was arrested in his apartment under a warrant charging violation of the mail fraud statute. His apartment was thoroughly searched for two canceled checks and any other means by which the crime charged might have been committed. In this search draft cards, property of the United States, possession of which was a federal offense, were discovered. Upon this evidence the accused was convicted of violation of the selective service act. It was held that this evidence was not obtained in violation of the Fourth Amendment and use of it was not a violation of the Fifth Amendment. The court said: "The Fourth Amendment has never been held to require that every valid search and seizure be effected under the authority of a search warrant. Search and seizure incident to lawful arrest is a practice of ancient origin and has long been an integral part of the law-enforcement procedures of the United States and of the individual states. The opinions of this Court have clearly recognized that the search incident to arrest may, under appropriate circumstances, extend beyond the person of the one arrested to include the premises under his immediate control. Thus in *Agnello v. United States, supra,* 269 U. S. [20] at page 30, 46 S. Ct. [4], at page

5, 70 L. Ed. 145, it was said: 'The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted.' It is equally clear that a search incident to arrest, which is otherwise reasonable, is not automatically rendered invalid by the fact that a dwelling place, as contrasted to a business premises, is subjected to search. Nor can support be found for the suggestion that the search could not validly extend beyond the room in which petitioner was arrested. Petitioner was in exclusive possession of a four room apartment. His control extended quite as much to the bedroom in which the draft cards were found as to the living room in which he was arrested. The cancelled checks and other instrumentalities of the crimes charged in the warrants could easily have been concealed in any of the four rooms of the apartment. Other situations may arise in which the nature and size of the object sought or the lack of effective control over the premises on the part of the persons arrested may require that the searches be less extensive. But the area which reasonably may be subjected to search is not to be determined by the fortuitous circumstance that the arrest took place in the living room as contrasted to some other room of the apartment." [Footnotes omitted.] *Harris v. United States,* 331 U. S. 145, 150-152, 67 S. Ct. 1098, 1101, 91 L. Ed. 1399. Four justices dissented. Nine months later the *Johnson* case, *supra,* and four months thereafter the *Trupiano* case, *supra,* were decided by the vote of one justice who had concurred and the four who had dissented in the *Harris* case, the other four who had concurred in the *Harris* case dissenting. The decision in the *Trupiano* case is concisely summarized in Chief Justice Vinson's dissenting opinion: "Federal officers, following a lawful arrest, seized contraband materials which

were being employed in open view in violation and defiance of the laws of the land. Today the Court for the first time has branded such a seizure illegal. Nothing in the explicit language of the Fourth Amendment dictates that result. Nor is that holding supported by any decision of this Court." 334 U. S. 710-711, 68 S. Ct. 1229, 1235, 92 L. Ed. 1663. The opinion of the court, in a paragraph partly quoted in the opinion of this court, all but in terms overruled the *Harris case,* "leaving it to another day" to declare expressly that the *Harris* case was overruled "by the rule that search warrants are to be obtained and used whenever reasonable practicable".

It is no proper concern of this court to approve, disapprove or predict the consequences of a decision of the Supreme Court. It is, however, appropriate to point out, when no federal question is before us, that a particular Supreme Court case or cases cannot be followed by us without overruling our own decisions (which we claim no right or power to do) and that, if followed, such cases would make a greater departure in Maryland law than in federal law. Without repeating the oft-told tale of the origin of federal and state constitutional provisions regarding searches and seizures, it is pertinent to note that before the Revolution the colonies were aggrieved, not by searches without a search warrant, but by searches made under search warrants authorized and issued under Acts of Parliament which did not adequately safeguard the issuance or the scope of such warrants. The question in *Boyd v. United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746, was the constitutionality of an Act of Congress. Many other Supreme Court cases have involved the construction of Acts of Congress and the constitutionality of such acts, as construed. One statute authorizing issuance of search warrants was passed in 1789, 1 Stat. 29, before the Fourth Amendment was proposed by Congress, and two more in 1790, 1 Stat. 145, and 1791, 1 Stat. 199, before the amendment was ratified. Up to three years ago 37 such statutes had been passed. [See list in appendix to dissenting opinion

of Mr. Justice Frankfurter in *Davis v. United States,* 328 U. S. at pages 616-623, 66 S. Ct. 1256, 90 L. Ed. 1453.] The Volstead Act broadly imposed duties, and conferred powers, to seize, with or without a warrant, liquors illegally transported or possessed and the automobile, boat or other vehicle in which they were found. A supplemental act, 42 Stat. 223, § 6, qualified these powers by making it a misdemeanor to "search any private dwelling * * * without a warrant directing the search" or "without a search warrant maliciously and without reasonable cause [to] search any other building or property." These statutes were construed (and, so construed, held constitutional) as authorizing, without a warrant, search of an automobile on a highway, seizure of liquor therein, and arrest, the court saying, "In cases where the securing of a warrant is reasonably practicable, it must be used, and when properly supported by affidavit and issued after judicial approval protects the seizing officer against a suit for damages. In cases where seizure is impossible except without warrant, the seizing officer acts unlawfully and at his peril unless he can show the court probable cause." *Carroll v. United States,* 267 U. S. 132, 156, 45 S. Ct. 280, 286, 69 L. Ed. 543, 39 A. L. R. 790. It may be that other statutes couple authority to search with a requirement, absolute or conditional, of a search warrant.

In Maryland there is no such maze of statutes. At common law the scope of search warrants was very limited. The Act of 1939, ch. 749, Code, Art. 27, secs. 306, 307, seems to be the only statute on the subject. The statute is general in terms, but apparently was passed because of the decision of this court, in *Sugerman v. State,* 173 Md. 52, 59-60, 195 A. 324, that there was no statutory authority for a search warrant to search an automobile. *Cf. Asner v. State,* 193 Md. 68, 65 A. 2d 881. No statute *requires* a search warrant in any case or in any way narrows the common law right of search incident to a lawful arrest. For this court to hold that this right no longer exists, or no longer can

be exercised without obtaining a search warrant "wherever reasonably practicable," would be sheer judicial legislation.

To follow the *McDonald* case, *supra,* it would be necessary for this court to overrule its own repeated decisions that only those whose property is invaded by an unlawful search or seizure may object to the admission of evidence so obtained. *Resnick v. State,* 183 Md. 15, 36 A. 2d 347; *Frank v. State,* 189 Md. 591, 56 A. 2d 810. In the *McDonald* case (for reasons not clear from the four different views of the six justices who concurred in the decision) an unlawful entry into the room of the keeper of a rooming house was held to make evidence obtained elsewhere in the house inadmissible as against one of her tenants and also as against a "guest" of his, *i. e.,* a partner in crime.

Judge HENDERSON authorizes me to say that he concurs in this opinion.