## HARRY MILLER *v.* STATE OF MARYLAND
### [No. 9, April Term, 1938.]

*Decided April 21st, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*Edward L. Ward* and *Michael F. Freedman,* for the appellant.

*Charles T. LeViness, 3rd,* Assistant Attorney General, with whom were *Herbert R. O'Conor, Attorney General, Hilary W. Gans, Deputy Attorney General,* and *Philemon B. Coulter, Assistant State's Attorney for Baltimore City,* on the brief, for the State.

OFFUTT, J., delivered the opinion of the Court.

Harry Miller, sometimes otherwise known as Harry Morris, born Philip Amolsky, was convicted in the Criminal Court of Baltimore City of the crime of maintaining and operating an establishment for gambling on horse races, contrary to the form of Code, art. 27, sec. 247, and from the judgment on that verdict he took this appeal.

In the course of the trial the State, over the defendant's objection, was permitted to introduce in evidence certain papers called in the argot of the business "run down sheets," "race horse bet slips," a number of pads of paper, and several telephone sets, which were seized by police officers of Baltimore City in a raid on the establishment. The defendant contends that the raid was trespass, that the seizure was unlawful, and that the material taken was inadmissible as evidence against him of the crime which they were offered to prove.

The raid and seizure were not authorized by any warrant or other legal process, and, unless authorized by a valid statute, or made with the defendant's consent, were made under circumstances which conclusively characterized them as unlawful. If the search and seizure were unlawful, then under Code Pub. Gen. Laws (Supp. 1935) art. 35, sec. 4A, the evidence thereby obtained was improperly admitted, and since it was vital and material, that conclusion would inevitably lead to a reversal of the judgment. So that the question in the case is, Was the search and seizure unlawful?

Before dealing with that question, some reference to the background of the case, and the circumstances attending the raid, will be helpful.

Mrs. Charles Lee Forbes owns a property, formerly called Forbes Hotel, at 307-309 McMechen Street in Baltimore City. The structure on these two numbered lots is used and managed as a single property. On April 29th, 1937, she leased the entire first floor of that property to Samuel Budlow for a term of two years at a total rent of $1,800. There are two apartments on the second floor and two on the third. One of these she occupies; the others she rents as she can. The defendant occupied one of the third floor apartments for about a year and a half before the trial as a tenant from month to month. Had the two lots been occupied by separate buildings his apartment would have been in No. 309, but access may be had to any of these upper apartments from either No. 307 or No. 309.

On April 23rd, 1935, Budlow, who was also a tenant of Mrs. Forbes at that time, applied for a license to operate a saloon or tavern to be known as "The Owl Tavern," at Nos. 307-309 McMechen Street, for the period of one year. Attached to the application was a statement made by the owner of the property, assenting to the issuance of the license and authorizing "The State Comptroller, his duly authorized deputies, inspectors and clerks, the Board of License Commissioners of Baltimore City, its duly authorized agents and employees and any peace officer of Baltimore City to inspect and search, without warrant, the premises upon which the business is to be conducted, and any and all parts of the building in which said business is to be conducted, at any and all hours." Code Pub. Gen. Laws (Supp. 1935) art. 2B, sec. 5, subsec. (13), provides that every application for a license under that article shall contain such a statement.

Section 34 of the same article, without reference to the consent required by section 5, subsec. (13), provides that: "The Comptroller, his duly authorized deputies, inspectors and clerks, the Board of License Commission-

ers of the County or the City in which the place of business is located, its duly authorized agents and employees, and any peace officer of such county or city, or any of them, shall be fully authorized to inspect and search, without warrant, at all hours, any building and premises in which any alcoholic beverages are authorized to be manufactured or sold under the provisions of this Article, and any evidence discovered during any such inspections shall be admissible in any prosecution for the violation of the provisions of this or any other Article, or upon any hearing for a revocation, suspension or restriction of the license of the person who has obtained a license to manufacture or sell alcoholic beverages in such building or premises."

It is not denied that by virtue of the consent and the statute the officials named therein may, without the authorization of legal process antecedently and lawfully issued, enter the premises of the licensee or the owner in a building in which there is a licensed saloon and search the same and seize any evidence of crime found there, but the question here is whether such officials may, without his consent, lawfully make such a search and seizure on the premises of a tenant in such a building, not connected or related to the licensee's business. The State contends that in such a case such a search and seizure may lawfully be made, the defendant contends that they cannot be so made, and that is the issue.

The suggestion is made by the State that, since the defendant's objection to the admission of the evidence involved in the exceptions raising that issue was general, and not on the specific ground that it was procured by an illegal search and seizure, it cannot be considered in this court. But when the evidence involved in at least three of the exceptions was introduced, it had been shown that the evidence was procured in the course of a raid in which a squad of police officers, without his permission and without a warrant, entered the defendant's apartment, arrested him, searched his apartment, seized his property, and delivered it to the police depart-

ment of Baltimore City. If it be assumed, by analogy to those cases in which the victim of an illegal search and seizure seeks the return of material taken in the course thereof, that the burden was upon the defendant to show the illegality of the seizure, and consequently, in connection with his objection, to offer proof of facts sufficient to condemn the seizure as illegal, nevertheless these facts would be *prima facie* sufficient to meet that burden, especially since the defendant had made a motion to suppress the evidence before the trial, and the court clearly indicated that he understood that the objection was based upon the ground that the seizure was illegal. The mere fact that the preliminary motion was inconsistent with the established practice in this state did not prevent its indicating the ground of defendant's objection. *Sugarman v. State,* 173 Md. 52, 195 A. 324, 326. The issue stated will therefore be accepted as sufficiently presented by the exceptions.

The argument in support of appellant's contention that the evidence involved in the exceptions was seized in the course of an illegal search rested upon two grounds: One, that immunity against unlawful search and seizure is personal and may not be waived except by the person whose rights are affected; and two, that it protects not only such person's dwelling, but also any premises lawfully in his possession. Both of these settled principles of constitutional law may be conceded without argument, but neither of them reaches the question in this case, which is not whether Miller waived his immunity, but whether he rented his apartment subject to the paramount right of the officials named in the statute to enter and search it at any and all times. In other words, the question is not whether he waived an immunity, but whether he had an immunity to waive.

The validity of Code Pub. Gen. Laws (Supp. 1935) art. 2B, sec. 5, subsec. (13), and section 34, is not questioned by the appellant, and may therefor, for the purposes of this case, be assumed (11 *Amer. Jur., Constitutional Law,* sec. 125), since every legislative enactment is pre-

sumed to be valid until judicially determined to be otherwise (59 *C. J.* 621), in some case where the question is formally submitted to the court for determination. *Ibid;* *Franklin v. State,* 12 Md. 236; *Cooley on Const. Lim.,* 382; 6 *R. C. L., Constitutional Law,* secs. 74, 98; *R. C. L., Perm. Supp.,* 1615, 1607.

The question therefore requires an interpretation of the statute, not a determination of its validity.

It is suggested by the appellee that the consent required of the owner of the property, by Code Pub. Gen. Laws (Supp. 1935) art. 2B, sec. 5, subsec. (13), in which a saloon is licensed to entry, inspection, and search by certain officials, extends to parts of the premises not occupied by the licensee or by the owner, but by others having no connection with the saloon and no relation other than that of a tenant to the owner. But there is nothing in the words of the paragraph to support that construction. The natural construction of the language would be that, in so far as the consent of the owner of the property may be necessary to the right of entry and inspection, he is required to give it, not that the owner could or is required to authorize such officials to search the apartments and premises of tenants over which he has no control. During the term of the tenancy, unless permitted by the terms of the lease, a landlord has no more right to enter premises possessed by the tenant than a stranger would have. It is axiomatic that one not antecedently authorized may not himself enter the property of a stranger, nor authorize another to do so. It cannot therefore be assumed that the Legislature intended that the consent required of the owner of the property should itself be sufficient to authorize the officials named in the statute to enter any premises other than such as were in the possession of the owner or of the licensee. If the entire building in which the saloon is conducted is in the possession of the owner, then the consent required by the statute is to a search and inspection of the entire building (*Zubowski v. State,* 167 Md. 549, 555, 175 A. 595) ; but if a part of it is in the possession

of a third person, the owner's consent does no more than estop him from objecting to the legality of a search of that part of the premises which is in the possession of the third person, but it does not prevent the third person from objecting. A stream can rise no higher than its source, nor can one grant what he has not, nor grant to others rights in the property of a stranger which he does not himself possess.

Authority for the search and seizure in this case, if it exists at all, must be found, therefore, not in the consent required by Code Pub. Gen. Laws (Supp. 1935), art. 2B, sec. 5, subsec. (13), but in section 34. As stated, *supra*, no question was raised in the trial court, nor indeed at all, as to the validity of that provision of the statute, so that again the question is merely one of interpretation.

It may be conceded that cases might well arise, in which the operation of the statute would be harsh, severe, and drastic, but with the policy of the law this court is not concerned. If the intention of the Legislature is clear, and the validity of its act is not questioned, it must prevail. In such legislation as this, consideration must be given to the effect of an inevitable conflict between two principles affecting the adequate administration of organized government; one the imperative duty of the State to prevent and suppress conduct which is *malum prohibitum* or *malum in se;* the other that which imposes upon the State the duty of protecting the citizen in the enjoyment of such privileges and immunities as are guaranteed to him by the Constitutions of the State or of the Nation. Of those immunities none is of greater, more immediate or more intimate importance to the citizen than immunity from unreasonable search and seizure, nor any which is the subject of more jealous and vigilant care by the courts.

Where, however, it is apparent that a strict, ritualistic, and rigid adherence to the letter of the immunity will prevent the adequate administration of law essential to the common welfare, the immunity yields to the common

need, so far, and only so far, as is reasonably necessary to adequately protect the whole people from the harms threatened by the prohibited conduct, unless such an accommodation is clearly forbidden by some constitutional provision. *May's Const. Hist. England,* ch. 11; *Cooley, Const. Lim.* 610 *et seq.* The reason for the condemnation of unreasonable search and seizure found in the Fourth Amendment of the Federal Constitution, in articles 26 and 22 of the Maryland Bill of Rights, and in the Constitutions of the several states, may be found in the apprehension, deeply implanted in the consciousness of the whole people, that the immunity should have some more substantial protection than the uncertain benevolence of the administrative and executive agents of the government.

An examination of the statute books of the Federal Government and the states demonstrates the necessity for these constitutional barriers, because they indicate a ceaseless steady pressure on the part of government to lessen the difficulty of convicting persons charged with crime by encroaching on these immunities. Many of these statutes are collected in *Cornelius on Search and Seizure,* sec. 5, notes 23 and 24.

With the astonishing growth in the efficiency and scope of organized crime, and the apparent interrelation between agencies employed in exploiting certain types of vice, such as gambling, prostitution, and the liquor traffic, the urge of officials charged with the protection of society against the ravages of organized crime to step beyond the barriers of constitutional limitations to reach those who use the benevolent immunities of the Constitution to promote their vicious activities is not unnatural. But changing circumstances and conditions do not themselves effect corresponding changes in the written language of the Constitution, for, as stated by Professor Cooley in his work on *Constitutional Limitations,* "Those beneficent maxims of the common law which guard persons and property have grown and expanded until they mean vastly more to us than they did to our ancestors, and are more

minute, particular, and pervading in their protections; and we may confidently look forward in the future to still further modifications in the direction of improvement. Public sentiment and action effect such changes, and the courts recognize them; but a court or legislature which should allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. * * * What a court is to do, therefore, is to declare the law as written, leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it."

In the field of regulatory law, more attention has perhaps been given by legislatures to the control and management of the liquor business than of any other traffic, because of the ease with which the privilege of engaging in it may be abused, and the social evils ordinarily incident to such abuse. The privilege of engaging in the traffic is not a right, but merely a franchise which the state may grant or withhold at will. As a corollary of that power, the State, if it elects to permit and license the traffic, may annex to its consent such conditions as are deemed necessary to prevent an abuse of the privilege, and, in so far as they affect the licensee, they are universally upheld. *Woolen & Thornton on Intoxicating Liquors*, sec. 88.

Nevertheless, the State cannot, under the guise of regulating the liquor traffic, override constitutional provisions designed to protect the person, the home, the property, and the papers of the citizen against unreasonable search and seizure, by authorizing the search and seizure, without warrant, of the premises, property, papers, or effects of persons not engaged or employed in that

traffic as a licensee or otherwise, and having no connection therewith. *Cornelius on Search and Seizure,* ch. 1.

Turning again to the contention of the State, that the raid, in the course of which defendant was arrested, his apartment entered, and his papers seized, was authorized by Code Pub. Gen. Laws (Supp. 1935) art. 2 B, sec. 34, consideration must be given to the necessary consequences of such a construction.

The section authorizes the comptroller, his deputies, inspectors, and clerks, the board of license commissioners, their deputies, inspectors, and clerks, and any peace officer of the county or city in which the business licensed is located, to enter without a warrant at all hours, and inspect and search "any building and premises in which any alcoholic beverages are authorized to be manufactured or sold" under the provisions of the article.

There are two possible constructions of that language; one, narrow, literal, and rigid, that by "building and premises" it means the whole building or premises in which the business is located and every part thereof, without regard to any connection between the person in possession of the premises searched with the business; the other, that by "building and premises," the Legislature meant only such part of the building and premises as are in the possession of the licensee or the owner of the building.

If the narrow literal construction is adopted, it necessarily follows that the Legislature intended to confer upon the officials named the right to enter at any hour of the day or night any part of any building in which alcoholic beverages are legally sold without any regard to the connection of the possessor of the premises searched with the business or his relation thereto. That would mean that any of the officials named may enter at any time any private apartment, any room in the largest hotel, any office in the largest office building, without warrant, if in any part of the building alcoholic beverages are legally sold. The transient guest in a hotel, the lessee of an apartment occupied as a permanent

home, would alike be subject at all times to having his privacy invaded, and his repose disturbed by the tramp of marching squads of police and inspectors, if in some part of the building, however obscure and remote, either in a club, or in a public saloon, alcoholic beverages are manufactured or sold.

Such a drastic and oppressive interference with the natural and accustomed right of the citizen to security in his home, his papers, and his effects would raise a grave constitutional question as to the validity of the statute; nor should the statute be construed to authorize it if any other construction may reasonably be adopted. *Cooley on Const. Lim.* 376, notes 2 and 3. For, as stated in *Federal Trade Commn. v. American Tobacco Co.*, 264 U. S. 298, 44 S. Ct. 336, 337, 68 L. Ed. 696, 700: "Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire (*Interstate Commerce Commission v. Brimson*, 154 U. S. 447, 479, 14 S. Ct. 1125, 38 L. Ed. 1047, 1058) and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. We do not discuss the question whether it could do so if it tried, as nothing short of the most explicit language would induce us to attribute to Congress that intent."

Article 26 of the Maryland Bill of Rights provides: "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted." If a general search warrant is condemned, how much more obnoxious must be an authorization to conduct a general and indiscriminate search of persons and property without any warrant. *Cornelius on Search and Seizure*, secs. 3, 4, 5; *Cooley on Const. Lim.* 610 *et seq.*

Because of that doubt it must be assumed that the

374

Legislature intended to limit the right of search and seizure without warrant, granted by the statute, to premises and property in the possession and control of the owner or the licensee, and that when it used the words "buildings and premises" it meant that part, and only that part, of the building or premises in which alcoholic beverages are sold, as is in the possession of the owner or the licensee. That construction is not only consistent with the spirit of the State Constitution, but is in harmony with those principles of personal liberty and security which find expression in the Fourth and Fifth Amendments to the Federal Constitution, and which in *Blum v. State*, 94 Md. 375, 51 A. 26, were said to be *in pari materia* with articles 26 and 22 of the Maryland Bill of Rights.

Since the search, in the course of which the papers offered in evidence and described in appellant's exception were seized, was illegal, under Code Pub. Gen. Laws (Supp. 1935) art. 35, sec. 4A, the seized papers were inadmissible in evidence against the appellant, and since they were vital and material to the State's case, the error committed in admitting them is reversible. The judgment appealed from must therefore be reversed.

*Judgment reversed, and case remanded for a new trial.*