## GIVNER *v.* STATE

[No. 162, October Term, 1955.]

*Decided July 12, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Eugene Hettleman* for appellant.

*James H. Norris, Jr., Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Anselm Sodaro,*

*State's Attorney for Baltimore City* and *James O'C. Gentry, Assistant State's Attorney,* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

The appellant was tried in the Criminal Court of Baltimore by the Court, sitting without a jury, and was found guilty of violating three provisions of the Baltimore City Code relating to inspections of buildings. He was fined $50.00 and costs, but the sentence was suspended (in accordance with the recommendation of the prosecuting attorney). Notwithstanding the suspension of sentence, this appeal is authorized. Code (1951), Article 27, Section 725; *Hite v. State,* 198 Md. 602, 84 A. 2d 899.

The first count of the indictment charged violation of Article 12, Section 120 of the Baltimore City Code, 1950 Edition (referred to below as the "City Code"). This Article is entitled "Health." The sub-title under which Section 120 is codified is "Nuisances and the Prevention of Disease," and Section 120 itself is under the sub-heading *"Removal of Nuisance."* This Section reads as follows:

> "120. Whenever the Commissioner of Health shall have cause to suspect that a nuisance exists in any house, cellar or enclosure, he may demand entry therein in the day time, and if the owner or occupier shall refuse or delay to open the same and admit a free examination, he shall forfeit and pay for every such refusal the sum of Twenty Dollars."

The second count alleged violation of Article 5, Section 120, Chapter 12, Paragraph 1202 of the City Code. This provision is contained in that portion of the City Code which is known as the Building Code. It reads as follows (the Commissioner therein referred to being the Building Inspection Engineer):

> "1202. The Commissioner or his authorized representative, upon exhibiting the proper credentials or proof of identity, if necessary, shall have the right to enter any building, structure or premises at any time during daylight hours, or at such other times as may

be necessary in an emergency resulting from or arising out of any cause that endangers or tends to endanger the public health or safety, for the purpose of performing his duties under this Code or enforcing the provisions of this Code."

The third count charges violation of Article 9, Section 26C of the City Code. That Section constitutes a part of the Fire Prevention Code. It reads as follows:

"C. Right of Entry. The Chief Engineer of the Fire Department or his authorized representatives when in uniform and upon exhibiting the proper credentials or proof of identity, if necessary, shall have the right to enter any building, structure or premises, except private residences, at any time during business or operating hours, or at such other times as may be necessary in an emergency resulting from or arising out of any causes that endanger or tend to endanger the public health or safety, for the purpose of performing his duties under this Fire Prevention Code, or enforcing the provisions of this Fire Prevention Code."

On the morning of February 1, 1955, representatives of the Commissioner of Health, of the Building Inspection Engineer and of the Chief Engineer of the Fire Department, accompanied by an Electrical Inspector and by a uniformed member of the Police Department assigned to work with the Health Department, visited the premises known as No. 1735 Linden Avenue for the purpose of making inspections in accordance with provisions of the Health laws, the Building Code and the Fire Prevention Code. The premises are owned by the appellant. The building consists of three floors and a basement. There are apartments on the second and third floors, which were then rented to and occupied by tenants of Givner, and the first floor and basement were occupied by Givner and his wife as their residence. The inspectors were permitted by the tenants to examine the second floor apartment, where some defective electrical fixtures were observed; and they also found the wooden porch on that floor, which is said to serve as a fire

escape, to be in need of some minor repairs. It seems that on this occasion the inspectors did not examine the third floor because the tenants were not at home.

The inspectors rang the door bell of the first floor apartment, and the door was opened by Mrs. Givner. They requested permission to enter, and she referred them to her husband, who was not then on the premises. The police officer had worked in the neighborhood for a year and was acquainted with the Givners. He then went to Mr. Givner's office and asked him to come to the Linden Avenue property to talk with the inspectors, and Mr. Givner did so ("gladly", the police officer says). The conversation between Mr. Givner and the inspectors took place on the sidewalk outside of No. 1735. Each of the inspectors asked permission to enter the first floor and basement, and Mr. Givner refused each request. He gave no reason for his refusal. These proceedings were initiated promptly thereafter.

At the trial in the Criminal Court Givner testified that his refusal was based upon the then pendency of a suit for a declaratory judgment which he had filed. In it he sought a determination as to what municipal personnel, if any, might go upon his premises for purposes of inspection, the circumstances under which they might enter, and whether or not he could be required to accompany the inspectors and to open any locked rooms. He also sought an injunction, both *pendente lite* and permanent, against the Building Inspection Engineer and the City of Baltimore, and their agents, from entering the three buildings mentioned in the suit without the consent of the occupants. He contended that the proposed or threatened inspections, without either permission or a search warrant, and without any cause or reason for such inspections being shown, constituted a violation of his constitutional rights against "unlawful" searches and seizures and also constituted a trespass and a wrongful taking of his property. The trial court dismissed the bill on the merits, holding in a memorandum opinion that there was nothing in the record to show any unreasonable search of property occupied by the complainant in violation of his constitutional rights and that the inspections complained of were necessary for the protection of the public health. See

*Givner v. Cohen,* 208 Md. 23, 116 A. 2d 357. The appellant undertook in this court (and we may suppose in the trial court also) to attack the same three municipal ordinances which he attacks in the present case. He did not, however, mention any one of them in his bill, nor did he make any of them a part of the record. The defendants cited one of them in their answer (as well as some other ordinances) ; but two of the three under attack were not properly brought before us and, furthermore, the complainant did not follow the prescribed declaratory judgment procedure with regard to notifying the Attorney General of an attack on the constitutionality of any of the ordinances. In addition, the facts of the case were very scanty, since the complainant elected to set the case for hearing on bill and answer. Because of the above deficiencies and the paucity of the facts and because of a reluctance to decide constitutional questions in the abstract, we thought the case was not ripe for a declaratory decree and affirmed the decree dismissing the bill.

In the instant case the appellant again assails the same three ordinances. By stipulation, Articles 5, 9 and 12 of the City Code and all ordinances contained therein are made a part of the record. These Articles include the ordinances under attack, which are those which we have quoted.

The appellant expressly waives all defenses on technical grounds which might be available to him. We take it that this waiver includes any objection to the third count of the indictment on the ground that the authority to inspect conferred under the Fire Prevention Code (Article 9, Section 26C) expressly excepts inspections of private residences. In connection with the construction of this ordinance we note that because of the definition of a private residence contained in Section 36 of that Article, which reads as follows: " 'Private residence' is a dwelling containing not more than one apartment, and which is occupied or intended to be occupied exclusively by one family and household help." The appellant's property at 1735 Linden Avenue falls within the definition of a "multiple dwelling" which is contained in the same Section. The Building Code (Article 5, Section 201) contains a definition of a private residence which is similar to that of the Fire Preven-

tion Code, except that it applies to a dwelling containing not more than two apartments, instead of only one.

The appellant raised below the question as to whether or not his refusal of permission to enter the premises constituted a violation of the Sections of the Building Code and of the Fire Prevention Code involved in the second and third counts of the indictment. Since he is and was quite familiar with *District of Columbia v. Little,* 339 U. S. 1, his waiver of this question in this Court is evidently made with full understanding and deliberation. We read the Sections of those Codes which are alleged to have been violated in conjunction with the definitions of violations contained respectively, in Section 190, Chapter 19, Paragraph 1901 of the Building Code and in Section 33, paragraph A of the Fire Prevention Code. These include in substantially identical terms any act or actions which are contrary to any provision or requirement of, and any and all failures to comply with, any provision or requirement of the pertinent code. So reading these provisions, we think that the appellant's refusal of permission to enter and inspect the first floor and basement of his building may properly be considered as a violation of the ordinances referred to in these counts. It is entirely clear, we may add, that his refusal constitutes a violation of the terms of Section 120 of Article 12 of the City Code, unless, as the appellant contended below, only the Commissioner of Health himself is authorized to make an inspection under that Section. We find no merit in that contention, and the appellant has waived it in this Court.

Before passing to other matters we may add that no question has been raised as to the power of the municipality to adopt any of the ordinances here involved, other than the claim that they authorize unlawful searches. We think that there is no doubt that these ordinances fall within the general scope of the powers granted to the City of Baltimore under its Charter. See Section 6 of the Charter (Flack's 1949 Edition) and the specific Paragraphs thereof referred to below, as well as in our opinion in *Givner v. Cohen, supra.* These include authorizations: by Paragraph (1) to regulate the use, operation and maintenance of buildings; by Paragraph (7) to provide for

protection against fires; by Paragraph (11) to provide for the preservation of the health of all persons within the City and to prevent and remove nuisances; by Paragraph (5) to enter, by its officers or agents, upon the lands or possessions of any person for the purpose of carrying out the powers enumerated in Section 6; and by Paragraph (24), subject to a proviso not here pertinent, to exercise within the limits of the City all of the police power which the State could there exercise.

The issue in this case is whether or not the three municipal inspectors acting under the Health, Building and Fire Prevention Articles of the City Code were or were not lawfully entitled to enter and inspect the plaintiff's residence. The answer depends upon whether or not the proposed inspections would infringe any constitutional right of the appellant under either the Federal or the State Constitution—specifically the Due Process Clause of the Fourteenth Amendment to the Federal Constitution or Article 26 of the Declaration of Rights of the Maryland Constitution.

Article 26 of the Maryland Declaration of Rights states "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted." It has been said by this Court in a number of cases that this Article is in *pari materia* with the Fourth Amendment to the Constitution of the United States. See, for example, *Blum v. State*, 94 Md. 375, 51 A. 26; *Bass v. State*, 182 Md. 496, 35 A. 2d 155; *Johnson v. State*, 193 Md. 136, 66 A. 2d 504. Our present Article 26 is derived *verbatim* (with the exception of very minor changes in punctuation) from Article 23 of our original Declaration of Rights which was embodied in our Constitution of 1776. Though it antedates the Fourth Amendment by some years both grew out of the same historical background, which has been traced many times. See, for example, *Boyd v. United States*, 116 U. S. 616; *Weeks v. United States*, 232 U. S. 383; dissenting opinion of Mr. Justice Frankfurter in *Harris v. United States*, 331 U. S. 145; *Miller v. State*, 174 Md. 362, 198 A. 710; *Bass*

v. *State, supra; Asner v. State,* 193 Md. 68, 65 A. 2d 881; *Cornelius* on *Searches and Seizures,* 2nd Ed., Section 35.

Our Article 26 does not, as does the Fourth Amendment, the text of which was derived from a Massachusetts constitutional provision (See Mr. Justice Frankfurter's opinion in the *Harris Case, supra,* at p. 158), contain an express declaration of the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures. However, Article 26 has been construed as a limitation upon the power of the Legislature to pass any law, or of the courts to issue any process, which would violate that Article. *Johnson v. State,* 193 Md. 136, 66 A. 2d 504. Such a construction accords in practical effect with the rule stated by the Supreme Court in *Wolf v. Colorado,* 338 U. S. 25 (and referred to in *Salsburg v. Maryland,* 346 U. S. 545) that a State may not affirmatively authorize an unlawful search and seizure without violating the Due Process Clause of the Fourteenth Amendment.

In *Miller v. State, supra,* at page 373 of 174 Md., page 716 of 198 A., the court said: "If a general search warrant is condemned, how much more obnoxious must be an authorization to conduct a general and indiscriminate search of persons and property without any warrant." See also *Mason v. Wrightson,* 205 Md. 481, 109 A. 2d 128, in which this passage from *Miller v. State* was quoted in holding the "frisking" of a patron of a night club in the course of a general search for concealed weapons to be unlawful.

Prior to the enactment of the "Bouse Act" in 1929, now (as amended) constituting Code (1951), Article 35, Section 5, evidence obtained by an unlawful search or seizure was admissible in evidence in the trial of both misdemeanors and felonies. Since the passage of that Act, such evidence is generally not admissible in misdemeanor cases, but it continues to be admissible in felony cases. (*Marshall v. State,* 182 Md. 379, 35 A. 2d 115; *Delnegro v. State,* 198 Md. 80, 81 A. 2d 241), and in some misdemeanor cases (*Salsburg v. State,* 201 Md. 212, 94 A. 2d 280, affd., *Salsburg v. Maryland,* 346 U. S. 545). Under the rule prevailing in the Federal courts and in a number of States, evidence illegally obtained is not admis-

sible at all in a criminal case. The Fourth Amendment is not applicable to the States (*Wolf v. Colorado*, 338 U. S. 25), though there have been and continue to be vigorous dissents from this view.

In the instant case we have problems under both the Maryland and the Federal Constitutions. In our view the problems under each narrow down to the same issue—Were the intended searches unlawful? *Wolf v. Colorado, supra*, poses the question in terms of the Due Process Clause of the Fourteenth Amendment. In that case the Supreme Court adhered to the doctrine of *Twining v. New Jersey*, 211 U. S. 78, *Palko v. Connecticut*, 302 U. S. 319, and *Adamson v. California*, 332 U. S. 46, that the Fourteenth Amendment is not "shorthand for the first eight amendments of the Constitution" and does not thereby incorporate them. The opinion of the Court, written by Mr. Justice Frankfurter, also reaffirmed the doctrine of the *Palko Case* that "This [the Due Process] Clause exacts from the States for the lowliest and the most outcast all that is 'implicit in the concept of ordered liberty'." It went on to say:

> "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause. The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned as inconsistent with the conception of human rights enshrined in the history and the basic constitutional documents of English-speaking peoples.
>
> "Accordingly, we have no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy it would run counter to the guaranty of the Fourteenth Amendment."

It is clear that prohibitions against unreasonable searches

and seizures do not prohibit reasonable searches and seizures. *U. S. v. Rabinowitz,* 339 U. S. 56. As *Cornelius* on *Searches and Seizures,* 2nd Ed., Section 35, states, "The constitutional provision in question, while primarily designed to protect the individual in the sanctity of his home and in the privacy of his books, papers and property, does not apply to reasonable rules and regulations adopted in the exercise of the police power for the protection of the public health, morals and welfare." He then cites as examples of such reasonable inspection laws those applicable to the books and records of pawnbrokers and requiring dealers to furnish samples of food. The inspection of inns or hotels and of institutions is upheld. *Hubbell v. Higgins,* 148 Ia. 36, 126 N. W. 914; *Sister Felicitas v. Hartridge,* 148 Ga. 832, 98 S. E. 538. A statute giving tax officials the right to examine the books and papers of taxpayers for the purpose of listing assessable property for taxation has been upheld. *Co-operative Building & Loan Ass'n v. State,* 156 Ind. 463, 60 N. E. 146.

Since the passage of the Bouse Act this Court has been called upon in numerous cases involving misdemeanors to determine whether or not a search is unlawful. None of the cases prior to the present case, except *Givner v. Cohen, supra,* have raised or sought to raise the question here presented.

The appellant relies principally upon the case of *Little v. District of Columbia,* 62 A. 2d 874 (Ct. of Mun. App., D. C.), affirmed 178 F. 2d 13, 85 U. S. App., D. C. 242 (Ct. of App., D. C. Circ.), affirmed 339 U. S. 1. The Municipal Court of Appeals reversed on constitutional grounds the conviction of Little on a charge that she had interfered with a health officer of the District of Columbia in the discharge of his duties.

In brief, the facts were that a health officer, in response to a complaint that there was an accumulation of loose and uncovered garbage and trash in the halls of the defendant's home and that certain of the persons residing therein had failed to avail themselves of the toilet facilities, went to the defendant's house to investigate the matter. She was away and the door was locked. The officer had no search warrant. While he was standing outside the door, the defendant returned. She protested his right to enter her home, saying that it would violate her constitutional

rights, and refused to unlock the door for him. She neither used nor threatened force of any kind. The Court of Appeals for the District of Columbia affirmed the judgment of the Court of Municipal Appeals by a 2-1 decision, in which both the majority and the minority proceeded entirely on constitutional grounds. In reviewing the case on *certiorari*, a majority of the Supreme Court, in an opinion by Mr. Justice Black, affirmed the judgment of the Court of Appeals on the ground that her "mere refusal to unlock the door accompanied by remonstrances on substantial constitutional grounds was" not "the kind of interference prohibited by the [District of Columbia health] regulation" upon which the prosecution was based. The majority found it unnecessary to decide the constitutional question of whether or not the Fourth Amendment prohibited the health officer from inspecting the premises without a search warrant. Mr. Justice Burton, with whom Mr. Justice Reed agreed, dissented on the factual question and disagree with the Court of Appeals on the constitutional question. Mr. Justice Burton said in the dissenting opinion:

> "In my opinion * * * the duties which the inspector was seeking to perform, under the authority of the District, were of such a reasonable, general, routine, accepted and important character, in the protection of the public health and safety, that they were being performed lawfully without such a search warrant as is required by the Fourth Amendment to protect the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." (339 U. S. 7-8.)

Though the appellant's brief tells us that there "are actually three opinions to be considered in the *Little* case"—the opinion of the Municipal Court of Appeals, the majority opinion in the Court of Appeals of the District of Columbia and the dissenting opinion in the Supreme Court—we think that he takes too narrow a view in omitting the majority opinion in the Supreme Court and the minority opinion in the Court of Appeals of the District of Columbia.

The majority opinion in the Court of Appeals of the District

holds squarely that the Fourth Amendment prohibits the search of a home by a health officer of the District without a search warrant. The minority opinion in that Court proceeds upon the view that the requirements for search warrants are applicable only in criminal cases, and that the object of a health department inspection is essentially a civil matter, to which any criminal prosecution is only incidental.

The majority opinion in the Supreme Court (at 339 U. S. 2-3) states that "The case raises important questions concerning legal provisions for protecting the health of the people by special and periodic inspection and elimination of potential sources of disease." We infer that this was the reason for granting *certiorari*. After a paragraph on page 3 from which we shall quote below, the Court said:

> "Neither the facts of this case, nor the District law on which the prosecution rests, provide a basis for a sweeping determination of the Fourth Amendment's application to all these varied types of investigations, inspections and searches. Yet a decision of the constitutional requirement for a search in this particular case might have far-reaching and unexpected implications as to closely related questions not now before us. This is therefore an appropriate case in which to apply our sound general policy against deciding constitutional questions if the record permits final disposition of a cause on non-constitutional grounds."

With regard to the constitutional arguments presented in the case, the Court said:

> "In this Court the constitutional arguments have extended far beyond the comparatively narrow issues involved in the particular case. At one extreme the District argues that the Fourth Amendment has no application whatever to inspections and investigations made by health officers; that to preserve the public health, officers may without judicial warrants enter premises, public buildings and private residences at any reasonable hour, with or without the owner's

consent. At the opposite extreme, it is argued that no sanitary inspection can ever be made by health officers without a search warrant, except with a property owner's consent. Between these two extremes are suggestions that the Fourth Amendment requires search warrants to inspect premises where the object of inspections is to obtain evidence for criminal punishment or where there are conditions imminently dangerous to life and health, but that municipalities and other governing agencies may lawfully provide for general routine inspections at reasonable hours without search warrants. An impressive array of facts is also presented concerning the uniform practices of agencies of local governments to provide for such general routine inspections in connection with sanitation, plumbing, buildings, etc."

Though the Fourth Amendment is not binding upon the States, this Court, in *Lambert v. State,* 196 Md. 57, at 62, 75 A. 2d 327, at 329, has recognized that in considering our own Constitution and statutes relating to the subject of unlawful searches and the admissibility of evidence thereby obtained, "decisions of the Supreme Court on the kindred 4th Amendment are entitled to great respect." This comment is obviously applicable in a case such as the present case in the light of the language of the Supreme Court in the *Wolf Case* which we have quoted and the question of whether or not the ordinances here involved amount to State authorization of an unlawful search.

It is true that there are statements in cases of high authority to the effect that a search of a home without a warrant, otherwise than as an incident to a lawful arrest, is unlawful. See *Agnello v. United States,* 269 U. S. 20, where the Supreme Court said that although the question had never been decided by that Court, it had always been assumed that such was the law. The Court went on to say, "The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws." The portions of that opinion just referred to are quoted with apparent approval and agreement in *Gorman v. State,* 161 Md. 700, 158 A. 903.

We may observe, however, that both the *Agnello* and the *Gorman Cases* dealt with criminal prosecutions, and it is by no means clear that the statements just referred to were intended to be applicable in other proceedings. In *Lambert v. State, supra,* this Court pointed out that general warrants of search in England and the colonies, against which American constitutional provisions were aimed, were used to find evidence which might be produced to convict political opponents; and in the *Gorman Case* itself a definition of an unreasonable or unlawful search which was cited with approval describes such a search as "an examination or an inspection without authority of law of one's premises or person, with a view to the discovery of stolen, contraband or illicit property, or for some evidence of guilt, to be used in the prosecution of a criminal action." The majority opinion of the Supreme Court in the *Little Case* clearly indicates that no such sweeping rule has been established in that Court as an all-inclusive application of the statement in the *Agnello Case* would call for or as the majority opinion in the Court of Appeals of the District of Columbia announced in the *Little Case* when it said: "We emphasize that no matter who the officer is or what his mission, a government official cannot invade a private home, unless (1) a magistrate has authorized him to do so or (2) an immediate major crisis in the performance of duty affords neither time nor opportunity to apply to a magistrate. This right of privacy is not conditioned upon the objective, the prerogative or the stature of the intruding officer."

If the majority of the Supreme Court in the *Little Case* had felt that either of the rules standing at opposite extremes of the constitutional contentions presented to it had been established, it would certainly not have been at pains, as it was, to say that it was disposing of the case on the grounds upon which the affirmance was rested in order to avoid deciding a constitutional question where "Neither the facts of this case, nor the District law on which the prosecution rests, provide a basis for a sweeping determination of the Fourth Amendment's application to all these varied types of investigations, inspections and searches." We, therefore, think that we may examine the facts of this case and may endeavor to determine

the law applicable thereto, without reason to believe that the principal question has been determined by any decision of the Supreme Court.

The duties of the Health Department, the Building Inspection Engineer and of the Fire Department to protect public health and safety hardly require elaboration, but several provisions of the Baltimore City Code may be worth special mention. Among these are: the provisions of Article 5 (the Building Code), Section 794, Par. 7942, requiring the rat-proofing of the ground floors of all buildings; Section 103, Par. 1032 of the same Article imposing responsibility upon the owner for compliance with the Code; and Article 9, Section 48, making it the duty of the Chief Engineer of the Fire Department to make all inspections of electrical wiring necessary to enforce the Fire Prevention Code.

Ordinance No. 1543 (1950-1951), which established the Housing Bureau of the Health Department is included in Article 12 of the City Code. Its preamble sets forth the reasons for and objectives of the so-called "Baltimore Plan" to fight residential "blight," in accordance with which inspection teams, such as that which visited Mr. Givner, operate. This preamble reads as follows:

> "Whereas, a major objective of the Mayor and City Council of Baltimore is to combat successfully slum and blighted areas and prevent their future growth and
>
> "Whereas, experience in the City of Baltimore has demonstrated that slum and blighted areas result in large measure from improper maintenance of dwellings, inadequate sanitation, over-crowding of dwellings and general community neglect in these areas and
>
> "Whereas, experience has also shown that through well-planned and vigorous enforcement of minimum housing standards for safety, sanitation, population density and public health, these conditions can be relieved and prevented and
>
> "Whereas, there has been developed in the City of Baltimore a municipal effort, known as 'The Balti-

more Plan', for combating residential blight by vigorous housing law enforcement, which program requires for its maximum effectiveness:

(a) Aggressive enforcement of housing ordinances and regulations through the efforts of several of the departments of the City and the utilization of their several enforcement procedures.

(b) Compelling compliance with said ordinances and regulations both in response to complaints and also at the initiative of the City on an area basis.

(c) Centralization in a single office of responsibility for assisting the several city departments involved in housing law enforcement in establishing policies, procedures and techniques which will assure uniform and consistent enforcement, and also for assisting these departments in planning their separate programs to avoid duplications, overlaps and conflicts, and to integrate the housing law enforcement effort with the programs of the Housing Authority of Baltimore City and the Baltimore Redevelopment Commission into an effective campaign against slum and blighted areas and

"Whereas, the Board of Estimates, prior to the adoption of this ordinance, has recommended the creation of an additional bureau in the Department of Health, to be known as the Housing Bureau, in order to meet the requirements of 'The Baltimore Plan' program hereinbefore recited * * *".

The attempted inspection of Mr. Givner's property was part of a project covering a rather large area in Baltimore known as the Mount Royal Area. It was undertaken in conjunction with a civic group and had as one of its objectives the elimination of rats. Dr. David Divis, Associate Professor at the School of Hygiene and Public Health of Johns Hopkins University, testified that since 1945 he has headed a program conducted by the school for the control of rats throughout the City, particularly the Mount Royal Area. He testified that he had studied the 1700 block of Linden Avenue, that about 1949 the

rats were eliminated from all outdoor areas in the block but
some rats were left in the basement of one house, and from
those the rat population in the whole block increased to a very
large number. He testified that there are fifty or so outdoor
rats in this particular block, and that he can tell from rats
going in and out of the house that there are plenty of rats in
the basement and other areas of "this house". Though no par-
ticular house was identified, No. 1735 was the only one in-
volved in the proceeding. He testified that the results of his
survey were known to Mr. Vidor. This, we think, is sufficient
to satisfy the requirements of Section 120 of Article 12 of the
City Code as to cause to suspect the existence of a nuisance.

Mr. Francis J. Vidor, Director of the Housing Bureau,
testified that several years previously the Health Department
had been requested by residents of the Mount Royal Area to
make a survey of housing conditions with the idea that "through
the rehabilitation of all exterior structures that neighborhood,
which is beginning to slip down toward slum conditions, could
be rehabilitated." He further testified that inspections (pre-
sumably of interiors as well as exteriors) had begun in the area
about a year before the trial in this case. He said that he was
familiar with the 1700 block of Linden Avenue, and in speak-
ing of Linden Avenue, by and large, he stated that the prop-
erties were overcrowded, that they lacked facilities and were
rat infested and poorly maintained.

The proof of the pudding is said to be in the eating. With
this in mind a report of the City Health Department made by
Mr. Vidor in 1954 relating to the Mount Royal Area is in-
teresting. It showed that out of 264 properties inspected, vio-
lations of one kind or another were found in 260 of them. A
breakdown pertaining to 92 properties showed, among other
things, that notices of health violations, usually combined with
notices of one or more other kinds of violations, were given
with regard to all but 5 of the 92. Only 2 were found to be
free of any cause for action.

In *Petrushansky v. State*, 182 Md. 164, 32 A. 2d 696, this
Court said (at 182 Md. page 173) : "But filthy and unsanitary
premises, especially when existing in large numbers, can easily
create a situation that may be a menace to the public health.

The city has the power under its charter "To preserve the health of the city', and "To prevent and remove nuisances.' The exercise of charter powers in a city is not discretionary, but is a duty."

We think it clear that an inspection by a health inspector is in the exercise of the police power, and we think that this is also true of the fire and building inspections.

We also note that all of the inspections authorized by the ordinances here involved are to be made at reasonable hours. There is no suggestion that any of the inspections was to be used as a cover to conduct a search for any violations of the criminal law or for any purpose other than the preservation of health and safety. There is no suggestion of harassment by repeated inspections.

Where there is reason to believe that a crime is being committed, but the circumstances are not such as to warrant an immediate arrest, and there is ample time to get a search warrant, the proper practice is to apply for such a warrant to be issued under Code (1951), Article 27, Section 328. *Johnson v. State,* 193 Md. 136, 66 A. 2d 504. This would also be sound practice if there were any occasion for a more extended search than that which might be authorized as an incident to a lawful arrest without a warrant. The statute just referred to is framed with a view to the detection of crime; and, as was suggested in *Givner v. Cohen, supra,* and in *Gattus v. State,* 204 Md. 589, 105 A. 2d 661, there is serious doubt as to whether a search warrant is obtainable except under a statute or to search for stolen goods or the like. This, of itself, would not prove that a search warrant is unnecessary, but it does tend to support the rather restricted common law concept of the office of a search warrant which, we think, was in mind at the time of the adoption of both our State and Federal constitutional provisions with regard to searches and seizures and search warrants. See *Gattus v. State,* just cited.

Few rights are absolute and certainly it is not a new problem in constitutional law to try to fit together and accommodate rights which may conflict, such as the right of freedom of speech or of the press on the one hand and the right to a fair

trial on the other. Here the problem is one of personal privacy as against the protection of the public health and safety.

We revert to the proposition that the prohibitions against unreasonable searches and seizures do not bar reasonable searches and seizures.

Historically, the abuses which gave rise to constitutional provisions against unreasonable searches and seizures grew out of searches for evidence to be used in criminal prosecutions. We regard it as at least doubtful that, under opinions of the Supreme Court, the scope of the Fourth Amendment may now be regarded as so limited. See the constitutional contentions stated in the majority opinion of the Supreme Court in the *Little Case* and, among earlier cases suggesting its applicability in civil matters, *Harriman v. Interstate Commerce Commission,* 211 U. S. 407, and *Federal Trade Commission v. American Tobacco Company,* 264 U. S. 298. We have not had occasion to consider such a question under Maryland law. The historical background of the constitutional provisions may, however,—and we think it does—throw some light on what would constitute an unreasonable search if made without a warrant. In the instant case, if despite the fact that the Fourth Amendment is not applicable, the tests of reasonableness which are applicable under it should be applied under either Maryland law or the Fourteenth Amendment, a search for evidence to prove guilt of a crime would present a situation which we should regard as substantially different from that presented by an inspection for the purpose of protecting the public health or safety. True, the privacy of the home of an individual is invaded whatever may be the reason for the search; but in the one case the liberty of the individual is at stake and in the other the health and safety of the public. The latter are the objectives of the inspection in the present case. In the usual course of procedure, if violations of the health, building or fire prevention codes are found, the property owner is informed of the violations and is ordered to correct them within a stated period, which is usually thirty days. If he fails to comply with such order, a prosecution is instituted for failure to do so.

In *United States v. Rabinowitz,* 339 U. S. 56, at 63, it is said

that "What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case."

The difficulty of establishing absolute criteria by which to determine the reasonableness of a search is manifest from the majority and the dissenting opinions in that case. Here we are called upon to determine whether the inspections sought to be made were or were not reasonable.

We believe that on its facts, on the basis of the ordinances involved and in the light of the established practices as to the enforcement of such ordinances in Baltimore, this case falls in the zone between the extremes of constitutional arguments which are stated in the *Little Case*. We have a legislative finding of facts embodied in the preamble to Ordinance No. 1543 that interdepartmental inspection and enforcement of minimum housing standards for safety, sanitation and public health are needed to combat urban blight and the growth of slum conditions, we have the results of actual inspections in the same general area made shortly before the attempted inspection of the appellant's home and we have the fact that these inspections are of a routine nature, are to be made at reasonable hours and are primarily for protective, not punitive purposes. In these circumstances, we consider the proposed inspections reasonable, and in our opinion the case falls within one of the intermediate constitutional contentions stated in the *Little Case* under which "municipalities and other governing agencies may lawfully provide for general routine inspections at reasonable hours without search warrants." We hold that such inspections are not unreasonable and hence are not unlawful.

If we are correct in our view that the inspections here involved are not unlawful, they do not involve any violation of the Fourteenth Amendment.

Accordingly, we are of the opinion that the judgment should be affirmed.

*Judgment affirmed, with costs.*