## BOARD OF HEALTH OF STATE OF MARYLAND v. CREW

[No. 87, October Term, 1956.]

*Decided February 12, 1957.*

*Motion for rehearing or modification filed February 28, 1957, denied March 5, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Frank T. Gray, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *Harry E. Dyer, Jr., State's Attorney for Harford County,* on the brief, for the appellant.

*George L. Clarke,* with whom were *George W. White, Jr., T. Leo Sullivan* and *Buckmaster, White, Mindel & Clarke* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Willoughby Beach is a community in Harford County of some forty homes, most of which front on Bush River. Edward J. Crew, the appellee, owns two of the houses and lives in one of them. There is no public sewerage system for the community; each house has its own septic tank or cesspool. There is a public water supply furnished by a privately owned corporation that is supervised by the State Health Department as to the purity of the water, and by the Public Service Commission as to service and rates. Crew became dissatisfied with the water when it developed an excessive iron content and turbidity. Discouragingly disconcerting, too, were frequent interruptions to service caused by breaks in the mains. In December, 1954, he began to dig a well near the house in which he lived, some fifty-five to sixty feet from the septic tanks of both of his houses, the two tanks being close together. He made no application to the State Health Department nor did he have a permit from the department to dig the well, as its regulations required. If he had sought a permit, it would not have been granted even though there was no public water supply available, since the regulations—duly adopted and promulgated under the authority of Code, 1951, Art. 43, Sec. 2—provided in Sec. 3:05e that a shallow dug well should be at least one hundred feet from any source of pollution.

When the well was about six feet deep, two representatives of the Health Department called on Crew and advised him that there might be danger of contamination of the water in the well and of the possibility that he would be unable to use it under the provisions of Code, 1951, Art. 43, Sec. 377. A copy of the statute was left with him. It provides:

> "Whenever a system of water supply or sewerage, serving the public, is directly available to any property upon which there exists a spring, well, cesspool,

privy, sink drain or private sewage disposal plant, which is or may become prejudicial to health, the State Board of Health may order said property to be connected with the water supply or sewerage system, and the spring, well, cesspool, privy, sink drain or private sewage disposal plant abandoned and left in such a way that it cannot be again used nor become injurious to health. The State Board of Health shall be empowered to prevent the construction of any proposed well, cesspool, privy, sink drain or private sewage disposal plant whenever or wherever it may deem that the proposed construction would be prejudicial to health. After April 16, 1914, no privy shall be built within the State of Maryland, except it be of such construction as will effectually prevent any contact of fecal matter with the soil and also access to such matter by flies. The State Board of Health shall be the judge as to whether or not any privy is built in conformity with this rule, and if it shall find that the regulation has not been strictly complied with, it shall condemn the structure and shall order that such changes be made as will be sufficient for compliance with this provision."

Crew chose to ignore the suggestions and completed his well to its finished depth of thirteen feet. After consultation with his superiors, Dr. Neil Gordon, Deputy State Health Officer for Harford County, acting on behalf of the State Board of Health, issued to Crew the following order dated January 7, 1955:

"Inspection of your premises located at Willoughby Beach, Maryland, shows that, although a system serving the public is directly available to the aforesaid property there now exists a well.

"Ordered by the State Board of Health under and by authority conferred upon it by Section 377, Article 43, Annotated Code, Laws of Maryland, 1951 Edition, and regulations issued pursuant to author-

ity conferred upon it by Section 2, Article 43 Annotated Code, Laws of Maryland, 1951 Edition, that the aforesaid well be abandoned, and left in such a way that it cannot be used again, on or before the 17th day of January, 1955."

Crew filed his bill of complaint against the members of the Board of Health, alleging that the order of January 7, 1955, was "* * * unlawful, unreasonable and unnecessary for the protection of the public health or comfort" and that it violated his rights under the Federal and State constitutions by depriving him of his property without due process of law. He prayed that the order be set aside and that the Board of Health be enjoined, preliminarily and finally, from enforcing the order. After a full hearing, the chancellor vacated the order and issued the perpetual injunction because, in his opinion, the Board of Health had "not only failed to show that the well was prejudicial to health at the time of the passage of the Order but they also failed to show that there is a reasonable possibility that it might become prejudicial to health."

The Department of Health argues that the statute forbidding the use of a well that is or may become prejudicial to health, when there is a public water supply directly available, is a constitutional and valid legislative exercise of the police power; and, this being so, one who attacks the validity of an order issued under the statute bears the burden of showing that the order was unreasonable or unnecessary and that Crew has not met the burden; and finally, that, other considerations aside, the order of the Health Department was valid since Crew had dug the well in violation of the regulations of the department.

The chancellor seems not to have passed directly on the first point but, rather, to have assumed that the statute was both constitutional and legal. The appellee does not challenge the statute in the abstract but relies on its inapplicability, legally and factually, under the circumstances here present. We think the statute is a proper and constitutional exercise of legislative power. The right of the State to require uni-

form compliance with reasonable standards designed to insure or tend towards the safeguarding of the public health by all, or selected groups of its citizens, is basic and firmly established even though compliance deprives the citizen of one or more of the bundle of rights that together comprise ownership or puts him to added expense. The right has been approved judicially in a variety of exercises. In *Hutchinson v. Valdosta*, 227 U. S. 303, 57 L. Ed. 520 (1913), the Supreme Court upheld, as had the highest court of Georgia, a town ordinance requiring all property owners abutting on a public sewerage system to connect with it and to abandon private systems. The Court found as a matter of course and without difficulty that the ordinance did not infringe any constitutional rights. The case was cited with approval in *Harlan v. Bel Air*, 178 Md. 260, 267, and its principles recognized, although held inapplicable on the facts. A similar but more drastic ordinance was upheld in *Sprigg v. Garrett Park*, 89 Md. 406, where the town was given expressly all of the powers of the State Health Department. In *Givner v. Commissioner of Health*, 207 Md. 184, a regulation of the Commissioner of Health of Baltimore, requiring a bathroom with tub or shower in good working condition in every dwelling unit, with certain exceptions, was approved. We held that the Commissioner had the power to deal prospectively with conditions that may menace health, and found that there was abundant testimony that, "in this time and place, the sharing of bathing facilities, particularly where the responsibility for cleaning the facilities is shared, is detrimental to physical and mental health and contributes to the spread of disease." We noted, "* * * that a visitor from abroad might be surprised to learn that a sharing of bathing facilities would render a dwelling unfit for human habitation." We said, too, that "It is not the function of the courts to pass upon the wisdom of the regulation, or to approve or disapprove it, if it does not exceed constitutional limits." The connection between the requirements of the statute before us in the present case and the public health would seem to be much more direct and apparent than the similar connection in the *Givner* case. We have no doubt that the statute is valid.

*Petrushansky v. State,* 182 Md. 164; *Comrs. of Vienna v. Phillips Co.,* 207 Md. 12; and *Givner v. State,* 210 Md. 484.

Crew concedes that he bears the burden of showing the invalidity of the action of the Health Department, under the holdings of *Pocomoke City v. Oil Co.,* 162 Md. 368, 380; and *Benner v. Tribbitt,* 190 Md. 6, 21. He argues that he has met this burden by showing that the order was unlawful, unreasonable and unnecessary, the conditions sufficient under Code, 1951, Art. 43, Sec. 382, to authorize the court to vacate the order and enjoin its enforcement. It is said that the order was unlawful because it required Crew to abandon his well when there was no system of public water supply "directly available", in that the water was not fit for human consumption nor in adequate supply, and it was not shown that the well "* * * is or may become prejudicial to health". It is said the order was unreasonable because the water from the Crew well was safe and adequate and cessation of use of that water required him to buy and use unsafe and inadequate water. The argument that the order was not necessary for the protection of public health is on the claim that not only had Crew's well been shown to supply safe and adequate water but other wells in the vicinity had done so for a number of years.

We think the arguments of the appellee go too far as to the public water supply and on that aspect are not supported by the evidence. His argument on the showing of prejudice to health in the use of the well which the chancellor accepted, underestimates the extent of the burden on a challenger to official action under a valid statute and imposes on the Health Department requirements of proof of existing or imminently probable contamination of the well for which there is no justification in the statute.

It was shown that there had been deterioration in the public water supply six months before the Crew well was dug. By virtue of drought conditions in 1953 and 1954, the wells from which the company got its water almost went dry, and a well was dug. The water from the well had a high iron content that made the water unpleasant to drink or to use for cooking or washing. When the system expanded to

take on new customers, its mains were installed by incompetent labor and, as a result, a number of breaks occurred. The unsatisfactory water and inadequate service brought about complaints to the Public Service Commission and the Health Department. A hearing was held by the Public Service Commission as to rates and service and, as a result, the company was required to remedy the conditions which had caused the complaints. The installation of the necessary equipment and the correction of the mistakes that had been made earlier took some time. It was shown, however, that by the end of April, 1955—the case was heard in September, 1955—the iron content in the water had been reduced to a satisfactory level, that turbidity had been eliminated, and that there had been no further substantial interruptions to service. At the time of the trial, the Public Service Commission was making frequent periodical inspections of the facilities, equipment and service of the water company and the Health Department was checking the purity of the water. Both testified that conditions were then satisfactory. Clearly the statute requires the use of a public water system because of the very fact that such a system is supervised by the public authorities and its adequacy and safety can be properly and regularly checked. We think it was shown that at least from April, 1955 on, there was directly available to Crew a public water supply within the meaning of the statute. Conditions the Health Department expected to exist on the effective date of the order—and on which the order was based—did exist several months later and at the time of the trial. This was enough to justify the action we think the chancellor should have taken—to refuse to vacate the order and to refuse the injunction. *Poole v. Miller,* 211 Md. 448.

The testimony showed that the order to Crew to discontinue the use of his well was issued after Dr. Gordon had determined, and the Health Department agreed, that a danger to health existed in the use of a private well in the Willoughby Beach area. Dr. Gordon explained that sewage from septic tanks and cesspools has to be purified by seeping through the ground. A soil that thus purifies the sewage gradually be-

comes contaminated itself, no longer acts as a purifier. The rate of absorption and the value of the soil as a purifier vary with the nature of the soil. Crew had testified the soil on his place was clay for a depth of seven or eight feet under several feet of top soil. A Health Department witness had tested the soil on a place adjoining Crew's and found it clay, with poor absorbtive powers. Dr. Gordon's testimony was that since a clay soil will not absorb sewage, it does not act as a purifying agent and that wells in an area where the soil is clay are likely to become contaminated. An entire area may become contaminated and the contamination may reach any or all of the wells of the area, particularly where the wells are shallow. Dr. Gordon would fix no definite time as to when this contamination might occur but said, in essence, that it could be the next day, the next week or next year. A well is considered to be contaminated when bacteria called coliform organisms, derived from warm blooded animals, including man, are found in the water. Dysentery can result from such organisms as well as typhoid fever. Dr. Gordon testified further that he had personally known of many cases where such contamination had occurred, and he mentioned Edgewood, which is near Willoughby Beach, as an area where this had occurred under conditions similar to those at Willoughby Beach. It was his opinion that there was "a considerable possibility" of the Crew well becoming contaminated under the circumstances. There was also testimony that a bad sample of water was found in a well near Crew's property. Crew offered no evidence to refute the Health Department testimony that a potential threat to health existed where a shallow well is dug in an area where there are close by a number of septic tanks and cesspools.

We think that the testimony shows that the order requiring the abandonment of the well was neither unreasonable nor unnecessary. The court below read the statute as if it required that no order could issue "unless the well is or *will* become prejudicial to health", but the statute only requires that the well *"may* become prejudicial to health". The Legislature undoubtedly contemplated that the Health Department could act where its observation of conditions, in the light

of its scientific knowledge of probabilities that might occur in the environment, led it to believe that health might be affected. The fact that the water from Crew's well had been proved to be pure on several occasions when tested is not decisive. Protection of the public health is not required to wait until contamination is shown to exist. The statute is written to operate prospectively for the protection of the public, as were the regulations upheld in *Givner v. Commissioner of Health*, 207 Md. 184, *supra*. The testimony showed that contamination to the Crew well might come about in the very near future, or perhaps not for some years, but that almost inevitably it would come about. We think it to have been lawful and reasonably necessary to the public health to have required Crew to cease using his property as he could have used it in the absence of the statute and to undergo such expense as would be required in the use of the public water supply.

We find no necessity to decide whether the order of January 7, 1955, could be sustained because Crew had violated the regulations of the Department of Health. In *Sprigg v. Garrett Park*, 89 Md. 406, *supra*, it was held that the town had the power to require the abandonment of a private sewerage system that was shown by the evidence to be so skillfully constructed that it was not likely to give rise to the danger against which the ordinance was aimed. It may well be the same holding could be made here, but since, in our view, the order of January 7, 1955, should be sustained under the statute, we do not pass on the point.

*Decree reversed, with costs.*